520 F.2d 676
 5 Envtl. L. Rep. 20,552
 UNITED STATES of America, Plaintiff-Appellee,
Quinault Tribe of Indians et al., Intervenors-Plaintiffs,
v.
STATE OF WASHINGTON, Defendant-Appellant,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Intervenors-Defendants,
Northwest Steelheaders Council of Trout Unlimited and Gary
Ellis,Intervenor-Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
Quinault Tribe of Indians et al., Intervenors-Plaintiffs,
v.
STATE OF WASHINGTON, Defendant,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Intervenors-Defendants,
Washington Reef Net Owners Association,
Intervenor-Defendant-Appellant.
UNITED STATES of America, Plaintiff,
Quinault Tribe of Indians et al., Intervenors-Plaintiffs,
Muckleshoot Indian Tribe et al., Plaintiffs-Appellants,
v.
STATE OF WASHINGTON, Defendant-Appellee,
Thor C. Tollefson, etc. et al., Intervenors-Defendants.
UNITED STATES of America, Plaintiff-Appellee,
Quinault Tribe of Indians et al., Intervenors-Plaintiffs,
v.
STATE OF WASHINGTON, Defendant-Appellant,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Intervenors-Defendants,
Carl Crouse, Director of the Department of Game, the
Washington State GameCommission,
Intervenors-Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
Quinault Tribe of Indians et al., Intervenors-Plaintiffs,
v.
STATE OF WASHINGTON, Defendant-Appellant,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Intervenors-Defendants,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, Intervenor-Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
Quinault Tribe of Indians et al., Plaintiffs,
v.
STATE OF WASHINGTON, Defendant,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Defendants,
Washington Reef Net Owners Association, Defendant-Appellant.
UNITED STATES of America, Plaintiff,
Quinault Tribe of Indians et al., Plaintiffs,
Puyallup Tribe of Puyallup Reservation, Plaintiff-Appellant,
V.
STATE OF WASHINGTON, Defendant-Appellee,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Defendants.
UNITED STATES of America, Plaintiff,
Quinault Tribe of Indians et al., Plaintiffs,
Nisqually Indian Community of the Nisqually Reservation,
Plaintiff-Appellant,
v.
STATE OF WASHINGTON, Defendant-Appellee,
Thor C. Tollefson, Director, Washington State Department of
Fisheries, et al., Defendants.
 Nos. 74-2414, 74-2437 to 74-2440, 74-2567, 74-2602 and 74-2705.
 United States Court of Appeals,
Ninth Circuit.
 June 4, 1975.
As Amended on Denial of Rehearing and Rehearing En Banc July 23, 1975.
 
 Don S. Willner (argued), Portland, Or., for appellant.
 Harry Sachse, Asst. U. S. Atty. (argued), Washington, D.C., for appellee.
 Before CHOY and GOODWIN, Circuit Judges, and BURNS,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 The United States brought this suit to enforce compliance by the State of Washington and its Departments of Game and Fisheries with certain treaties between the federal government and various Indian tribes of western Washington (treaty Indians; treaty tribes). The Government initially represented the interests of seven named tribes. Other tribes intervened, and fourteen tribes are now named parties plaintiff. Organizations of commercial and sports fishermen intervened as parties defendant or participated as amici curiae.
 
 
 2
 The district court found that Washington could not apply its existing fishing regulations to members of the treaty tribes without violating their federal treaty rights. The court held that the state could enforce only those regulations necessary for conservation, decreed an allocation of fishing opportunity between treaty Indians and other citizens,[1] and retained continuing jurisdiction to provide advance judicial scrutiny of all future state regulations affecting Indian treaty fishing rights. United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974). Both sides appealed.[2] We affirm and remand.
 
 Historical Background
 
 3
 In the early 1850's, an increasing flow of American settlers poured into the lowlands of Puget Sound and the river valleys north of the Columbia. Washington Territory was organized in 1853. Isaac Stevens, its first governor, was commissioned to smooth the way for settlement by inducing the Indians of the area to move voluntarily onto reservations.
 
 
 4
 George Gibbs' official chronicle of the treaty proceedings reveals the governor as a tactful and effective negotiator. He united the scattered Indian communities into a number of tribes and selected "chiefs" from each tribe with whom to bargain. The Indians west of the Cascade Mountains were known as "fish-eaters"; their diets, social customs, and religious practices centered on the capture of fish. Their fish-oriented culture required them to be nomadic, moving from one fishing spot to another as the runs varied with the seasons. Stevens nevertheless persuaded them to settle down on designated reservations, thus freeing the great bulk of the land for American settlement without a bloody war of conquest. In exchange, he promised the tribes money and the benefits of the white man's civilization material goods and education. Governor Stevens assured them, moreover, that they were restricted to the reservations only for the purpose of residence; he explained that they would remain free to fish off the reservations at their traditional fishing places in common with the white settlers.
 
 
 5
 In negotiating the treaties, Stevens read a predrafted document and asked for the Indians' comments and approval. Although the treaties read as typical legal documents, few if any of the Indian negotiators read or spoke English. The treaties and the Americans' explanation of their terms were translated into Chinook jargon, a trade medium of some 300 words common to most Northwest Indians. The district court found that the jargon was inadequate to express more than the general nature of the treaty provisions.
 
 
 6
 During 1854 and 1855, Stevens executed treaties with all of the treaty tribes. Each treaty contained a provision guaranteeing off-reservation fishing rights similar to that found in the Treaty of Medicine Creek, 10 Stat. 1132:
 
 
 7
 The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . ..
 
 
 8
 To this day, fishing remains an important aspect of Indian tribal life, providing food, employment, and an ingredient of cultural identity. Indians have adopted modern techniques of sport and commercial fishing. They share the concern of other citizens with preservation of runs of anadromous fish. Some tribes regulate the times and manner of fishing by their members.
 
 Decree of the District Court
 
 9
 The district court held that the state and its agencies can regulate off-reservation fishing by treaty Indians at their usual and accustomed grounds only if the state first satisfies the court that the regulation is reasonable and necessary for conservation. The court defined "conservation" as the perpetuation of a run or of a species of fish. The state must also show that the conservation objective cannot be attained by restricting only citizens other than treaty Indians. In addition, the regulation must not discriminate against treaty Indians and must meet appropriate due process standards.
 
 
 10
 Those treaty tribes meeting certain qualifying requirements (384 F.Supp. at 340-41) may regulate fishing by their own members free from any state regulation. Qualified tribes will be required, however, to fulfill certain conditions designed to keep the state informed concerning their regulations and fishing activities. The court found the Yakima Nation and the Quinault Tribe already qualified for self-regulation.
 
 
 11
 Each year, a certain escapement of fish is necessary to preserve the run. After this escapement has been allowed by either state or tribal regulation, the remainder of the run is available for harvest. The court decreed an allocation of this harvestable run between the treaty tribes and other citizens. The state may not regulate treaty Indians' taking of this harvestable run at their "usual and accustomed grounds and stations" unless necessary to limit them to 50 percent of the harvest at those grounds. Treaty Indians thus are to have the opportunity to take up to 50 percent of the available harvest at their traditional grounds.
 
 
 12
 The harvest to be allocated comprises not merely those fish which actually pass the traditional fishing grounds, but also those captured en route and those bound for those grounds but caught in marine waters by non-treaty fishermen. The court decreed an "equitable adjustment" to the harvestable catch to compensate for attrition from these sources. On the other hand, those fish caught by treaty Indians on reservations or taken for traditional tribal ceremonies or personal consumption by tribal members and their immediate families are to be totally disregarded in calculating the harvestable catch.
 
 
 13
 The state and its agencies challenge virtually all of these features of the district court's decision.
 
 Federal Preemption of State Regulation
 
 14
 By virtue of its police power, the state has initial authority to regulate the taking of fish and game. Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896). The federal government, however, may totally displace state regulation in this area. For example, Congress has the power, under the commerce clause, to authorize construction of hydroelectric facilities, even though a dam totally destroys existing runs of fish in the river in violation of the public policy of the state and the desires expressed by a majority of its enfranchised citizens. See City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); Washington Department of Game v. FPC, 207 F.2d 391 (9th Cir. 1953), cert. denied, 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954). The federal government may also preempt state control over fish and game by executing a valid treaty and legislating pursuant to it. Missouri v. Holland,252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920). Furthermore, such a treaty may preempt state law even without implementing legislation; a treaty guaranteeing certain rights to the subjects of a signatory nation is self-executing and supersedes state law. Asakura v. City of Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041 (1924). Consequently, the state may enact and enforce no statute or regulation in conflict with treaties in force between the United States and the Indian nations.
 
 
 15
 At issue, however, is not the federal government's power in executing treaties to preempt all state regulation of Indian fishing, but whether it has in fact done so. "Absent express federal law to the contrary, Indians going beyond the reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); see Carey v. South Dakota, 250 U.S. 118, 122, 39 S.Ct. 403, 63 L.Ed. 886 (1919). A treaty guaranteeing a right to fish distinct from that enjoyed by other citizens would be such an "express federal law." In deciding whether the Stevens treaties created federal rights immune from abridgement by state law, we must read their terms against a "backdrop" of Indian sovereignty, recalling that when the treaties were signed, the United States regarded the tribes as nations, independent and sovereign. McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).
 
 
 16
 Although the United States dealt from a clearly superior position, the treaties were negotiated at arms' length. The treaties were not dictated to a defeated nation. The United States wished to free most of the land in the Puget Sound area for the impending white migration and settlement. Governor Stevens' task in executing the treaties was to induce the Indians to move onto reservations. The Indians expressed their concern that they would be unable to continue their traditional way of life, centered on the gathering of fish, because of limited fishing opportunities on the proposed reservations. The governor overcame their fears by promising them continued access to their traditional fishing areas off the reservations.
 
 
 17
 The treaties were "not a grant of rights to the Indians, but a grant of rights from them a reservation of those not granted." United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). The extent of that grant will be construed as understood by the Indians at that time, taking into consideration their lack of literacy and legal sophistication, and the limited nature of the jargon in which negotiations were conducted. See id. at 380, 25 S.Ct. 662. Although ceding their right to occupy the vast territories in which they had been accustomed to roam unimpeded, the Indians reserved their traditional right to fish at their accustomed places. They granted the white settlers the right to fish beside them. In a sense, the treaty cloaks the Indians with an extraterritoriality while fishing at these locations. Although present Indian status is not understood in terms of tribal sovereignty, recalling past acceptance of that concept aids in perceiving the Indians' understanding of the effect of the treaties which they signed. They retained the right to continue to fish as they were accustomed. Certainly, they did not understand that in permitting other citizens access to their traditional fishing areas they were submitting to future regulations calculated to benefit those other citizens.
 
 
 18
 Nevertheless, this is precisely how the state of Washington has regulated fishing for years. In treating treaty Indian fishermen no differently from other citizens of the state, the state has rendered the treaty guarantees nugatory. As the non-Indian population has expanded, treaty Indians have constituted a decreasingly significant proportion of the total population, catching a decreasing proportion of a fixed or decreasing number of fish. "This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." Winans, 198 U.S. at 380, 25 S.Ct. at 664. See Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975).
 
 
 19
 In summary, the Indians negotiated the treaties as at least quasi-sovereign nations. They relinquished millions of acres of their lands, retiring to reservations carved out of those lands. But they expressly reserved their indispensable rights to fish at their traditional places. The United States obtained for the settlers and for the subsequently-admitted state only the right of equal access to these fishing grounds. The treaty provision at issue grants the state's other citizens only a limited right to fish at treaty places; it thus is "express federal law" preempting all state regulation of Indian fishing at the treaty fishing grounds, except as hereafter stated. Compare Mescalero, 411 U.S. at 148-49, 93 S.Ct. 1267.
 
 State Regulation for Conservation
 
 20
 The relationship between treaty Indians and other fishermen which these treaties created is unique. The two groups of fishermen do not share a cotenancy in the fish or in the opportunity to fish. Nevertheless, their relationship is analogous to a cotenancy, and the experience of courts in adjusting competing claims between cotenants sheds light on the interpretation of the parties' treaty rights.
 
 
 21
 Cotenants stand in a fiduciary relationship one to the other. Each has the right to full enjoyment of the property, but must use it as a reasonable property owner. A cotenant is liable for waste if he destroys the property or abuses it so as to permanently impair its value. See Comment, The Inter Vivos Rights of Cotenants Inter Se, 37 Wash.L.Rev. 70, 76 (1962). A court will enjoin the commission of waste.
 
 
 22
 By analogy, neither the treaty Indians nor the state on behalf of its citizens may permit the subject matter of these treaties to be destroyed. The state may interfere with the Indians' right to fish when necessary to prevent the destruction of a run of a particular species in a particular stream. Thus, the Supreme Court has held that the state may regulate the time and manner in which the Indians take their catch when " necessary for the conservation of fish." Puyallup Tribe v. Department of Game of Washington (Puyallup I), 391 U.S. 392, 399, 402 n. 14, 88 S.Ct. 1725, 1729, 20 L.Ed.2d 689 (1968); Tulee v. Washington, 315 U.S. 681, 684, 62 S.Ct. 862, 86 L.Ed. 1115 (1942).
 
 
 23
 The state defines "conservation" to embrace three objectives and urges that it should be allowed to curtail Indian fishing in pursuit of conservation so defined: 1) allowing sufficient escapement to perpetuate the fish run; 2) assuring the maximum sustained harvest; and 3) providing for an orderly fishery. But the only rationale for permitting state interference with Indian fishing precludes adoption of this definition and restricts the meaning of conservation to insuring optimum spawning escapement for perpetuation of the run. "Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival." Department of Game of Washington v. Puyallup Tribe (Puyallup II ), 414 U.S. 44, 49, 94 S.Ct. 330, 334, 38 L.Ed.2d 254 (1973).
 
 
 24
 The state's program for management of the state's fisheries may appear sound and commendable, but the state shares its rights in those fisheries with another party. It may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens. The state must pursue its goals as best it can by regulating its own non-treaty Indian citizens. The state may secure treaty Indians' compliance with these regulations only by gaining their acquiescence in its goals. Direct regulation of treaty Indian fishing in the interests of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power jurisdiction. Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1975).[3]
 
 Tribal Self-regulation
 
 25
 Preservation of fishery resources is of vital importance to Indians as well as to other citizens. At the same time, regulatory interference by the state with treaty fishing is obnoxious to the treaty tribes. These tribes have the power to regulate their own members and to arrest violators of their regulations apprehended on their reservations or at usual and accustomed fishing sites. Settler v. Lameer, 507 F.2d 231 (9th Cir., 1974). The court, in its equitable discretion, decided that qualified tribes should have the power, subject to certain conditions, to regulate their own members in the interest of conservation free of state controls. So long as the tribes responsibly insure that the run of each species in each stream is preserved, the legitimate conservation interests of the state are not infringed. We hold that the court did not abuse its discretion.[4]Apportionment of the Right to Fish
 
 
 26
 The necessity to limit the catch to preserve a run defines the extent to which the state may exercise police power to regulate Indian fishing. By the treaty, the Indians granted citizens of the territory the right to fish in common with them, however, and the state may enforce regulations insuring that both groups of fishermen have fair access to the fish at the treaty areas. State officials are in close daily contact with fishing conditions in Washington; they should be permitted a certain amount of flexibility in devising rules to assure both groups opportunity to exercise their rights. In so regulating, however, they must be aware that they are not enforcing state policies but applying federal rights to concrete situations. Therefore, the district court wisely insisted that proposed state regulations be submitted to it for approval before being enforced as to treaty Indians.
 
 
 27
 The treaty provides only that those Indians may fish "in common with" other citizens at the traditional grounds. The legal effect of this clause has been much disputed. The district court interpreted it as justifying an equal apportionment of the opportunity to take fish:
 
 
 28
 (N)on-treaty fishermen shall have the opportunity to take up to 50% of the harvestable number of fish that may be taken by all fishermen at usual and accustomed grounds and stations and treaty right fishermen shall have the opportunity to take up to the same percentage of harvestable fish . . . .
 
 
 29
 384 F.Supp. at 343.
 
 
 30
 The state argues that the term "in common with" was intended merely to insure that the treaty Indians would not be treated discriminatorily, that each Indian should have access to the traditional fishing grounds on the same footing as each white settler. The Supreme Court long ago considered this construction, however, and rejected it. United States v. Winans, 198 U.S. 371, 379-82, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).
 
 
 31
 In the early years following the signing of the treaties, a policy of providing all individuals with equal access to fishing grounds sufficiently guaranteed all parties' rights under the treaties. White civilization has since engulfed that of the Indian, however. Demand for fish has outstripped supply. By continuing to treat the outnumbered treaty Indians no differently from other citizens, the state effectively allots them a decreasing share of the resource.
 
 
 32
 A cotenant dissatisfied with his partner's exploitation of their common property may seek a partition of the property in order to protect his interest in it. Comment, supra, 37 Wash.L.Rev. at 77. By analogy, the Indians are entitled to an equitable apportionment of the opportunity to fish in order to safeguard their federal treaty rights. See Puyallup II, 414 U.S. at 48-49, 94 S.Ct. 330. The district court's apportionment does not purport to define property interests in the fish; fish in their natural state remain free of attached property interests until reduced to possession. Greer,161 U.S. at 529, 16 S.Ct. 600. Rather, the court decreed an allocation of the opportunity to obtain possession of a portion of the run.
 
 
 33
 The district court has a great amount of discretion as a court of equity in so devising the details of an apportionment as to best protect the interests of all parties, as well as those of the public. See Lemon v. Kurtzman, 411 U.S. 192, 200-01, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In legislative reapportionment cases, for example, the Supreme Court has been content to review and decide the broad standards (one man, one vote) dictated by the fourteenth amendment, leaving the details of the implementation of those standards to the equitable discretion of the district courts. See, e. g., Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Similarly, we propose to state only those fundamental legal principles which define the parties' respective rights, reviewing the remainder of the district court's decree only for abuse of discretion.
 
 
 34
 We affirm the conclusion of the district court that the fundamental principle to be applied in a judicial apportionment is that treaty Indians are entitled to an opportunity to catch one-half of all the fish which, absent the fishing activities of other citizens, would pass their traditional fishing grounds. This conclusion follows naturally from the circumstances in which the treaties were signed.
 
 
 35
 The treaties must be viewed as agreements between independent and sovereign nations. McClanahan, 411 U.S. at 172, 93 S.Ct. 1257. The "tribes" in western Washington were constructed somewhat arbitrarily by Governor Stevens for his convenience in negotiating the treaties. Each tribe in many cases was an aggregate of smaller, more natural units communities or villages. Nevertheless, each tribe was understood to be an entity for the purpose of each treaty.
 
 
 36
 Each tribe bargained as an entity for rights which were to be enjoyed communally. See Sac and Fox Indians (Iowa) v. Sac and Fox Indians (Oklahoma), 220 U.S. 481, 483-84, 31 S.Ct. 473, 55 L.Ed. 552 (1911). The reservations were reserved to each tribe qua tribe. Not until 1887 was the President authorized to allot reservation land to individual Indians. 24 Stat. 388. Individual Indians had no individual title to property, but participated in the communal rights of the tribe. "The right of the individual Indian is, in effect, a right of participation similar in some respects to the rights of a stockholder in the property of a corporation." F. Cohen, Handbook of Federal Indian Law 183 (1942, reprinted 1971). The right to fish at usual and accustomed grounds was one such communal property right pertaining to the tribe. Whitefoot v. United States, 293 F.2d 658, 663, 155 Ct.Cl. 127 (1961), cert. denied, 369 U.S. 818, 82 S.Ct. 629, 7 L.Ed.2d 784 (1962); Juergensmeyer & Wadley, The Common Lands Concept: A "Commons" Solution to a Common Environmental Problem, 14 Natural Resources J. 361, 372 (1974). To hold that the Indian negotiators intended to secure for each member of the tribe the right to compete for fish on equal terms as an individual with each individual settler the state's view of the "in common with" clause as a prototype of the fourteenth amendment's equal protection clause thus would be to disregard the fabric of Indian society at the time the treaties were concluded, a society of communality whose nature was reflected in the subsequent legal character of property ownership which evolved in Federal Indian law. See F. Cohen, supra.
 
 
 37
 In each treaty, two parties the United States and a tribe bargained on the basis of formal equality. An attempt to partition equitably rights which these parties were to hold in common must reflect this initial equality. The district court was not required to decree a perfect 50-50 division of fishing opportunity. Cf. Mahan v. Howell, 410 U.S. 315, 332-33, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The court itself recognized the difficulty in practice of attaining that theoretical ideal. 384 F.Supp. at 343-44. Nevertheless, a 50-50 apportionment reflects the equality existing between the two bargaining parties and best effectuates what the Indian parties would have expected if a partition of fishing opportunities had been necessary at the time of the treaties. Thus the court's apportionment was well within its discretion.
 
 
 38
 "Equitable Adjustment"
 
 
 39
 Today, the treaty Indians' "usual and accustomed" fishing grounds in general are located upstream from sites of intensive non-treaty Indian fishing. Because the parties to the treaties did not anticipate shortages of harvestable fish, they did not foresee that downstream fishing by non-Indians would someday injure the Indians' right to fish at their usual places. Therefore, the Indians are entitled to catch 50 percent not simply of the fish passing the traditional grounds, but also of those destined for those grounds but captured downstream or in marine waters.
 
 
 40
 The district court acknowledged the difficulty in determining with mathematical precision the number of fish bound for the tribes' fishing areas. The court recognized that a large portion of these fish are taken outside the jurisdiction of the state. Furthermore, many caught within Washington waters are taken under regulations issued by the International Pacific Salmon Fisheries Commission. On the other hand, it is reasonable to suppose that many fish appropriated beyond the state's regulatory jurisdiction are nonetheless taken by Washington citizens.
 
 The court decreed:
 
 41
 An additional equitable adjustment, determined from time to time as circumstances may require, to compensate treaty tribes for the substantially disproportionate numbers of fish, many of which might otherwise be available to treaty right fishermen for harvest, caught by non-treaty fishermen in marine areas closely adjacent to but beyond the territorial waters of the State, or outside the jurisdiction of the State, although within Washington waters.
 
 
 42
 384 F.Supp. at 344. We agree with the state that the court's equitable discretion does not extend so far as to permit it to compensate the tribes for the unanticipated heavy fishing by foreign ships off the coast. The treaty granted equal rights at the traditional areas to Washington citizens, and their ability to fish is equally impaired by foreign fishing. On the other hand, Washington citizens who benefit from marine catches of fish bound for traditional areas, regardless of whether they are subject to state regulation while fishing, have received a portion of the non-treaty Indian entitlement under the treaty. The court therefore may act within its equitable discretion by adjusting the number of fish which the treaty Indians have an opportunity to catch in such a way as to reflect roughly the fact that non-treaty Indian citizens have already received a portion of their share of the run past the treaty sites even before the state obtained jurisdiction over their activities.
 
 
 43
 Insofar as the 1937 convention between the United States and Canada for the protection of the Fraser River fish runs, 50 Stat. 1355, the Sockeye Salmon or Pink Salmon Fishing Act of 1947, enacted pursuant to the convention, 16 U.S.C. §§ 776-776f, and regulations issued thereunder displace the regulatory powers of the state within the state's territorial waters, fishing within those waters should be treated no differently from fishing beyond the state's territorial jurisdiction. The court therefore may adjust equitably the treaty Indians' share to compensate them for fish taken by other Washington citizens under regulations issued by the International Pacific Salmon Fisheries Commission which otherwise would be available for harvest at their traditional treaty areas. The court may so adjust the tribes' allocation to compensate, of course, only those tribes which share in the harvest of Fraser River salmon or other fish affected by the Commission's regulations at their traditional areas. Losses in the catch of those fish not regulated by the Commission caused by Commission regulation of fishing gear may also be compensated.
 
 
 44
 We reject the state's contention that the Convention and Act have " pre-empted" Indian treaty rights to harvest Fraser River salmon. The Supreme Court has indicated its extreme reluctance to find congressional abrogation of Indian treaty rights in the absence of explicit statutory language so directing. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Congress sufficiently indicated its intent that all persons, including Indians, be subject to Commission regulations, but, in the absence of an explicit expression of intent to terminate treaty rights, losses to other citizens sustained through compliance with those regulations should be redressed as above stated by adding to the treaty Indians' permitted catch in areas under state jurisdiction.
 
 Fish Taken on Reservations
 
 45
 The state contends that fish caught by treaty Indians on their reservations should be included in their 50 percent allocation of the catch. Analysis of the structure of a typical treaty, the Treaty of Medicine Creek, 10 Stat. 1132, is instructive. In Article I, the Indians ceded their lands to the United States. In Article II, however, the treaty reserved "for the present use and occupation of the said tribes and bands, the following tracts of land. . . ." Finally, in Article III, "(t)he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory. (Emphasis added)"
 
 
 46
 The right to take fish in common with the settlers off the reservations was a right reserved by the Indians in addition to their right to occupy and use reservation land. The settlers obtained no analogous rights on the reservations. Other citizens clearly have no more claim to a share of the fish caught on the reservations than they do to a right to reside on those reservations. The court thus did not abuse its discretion in excluding fish caught on the reservations from the apportionment.
 
 
 47
 We also affirm its decision, uncontested by the state, that fish taken off the reservation and actually used for traditional tribal ceremonies or for personal subsistence consumption by members of the tribe and their families shall not be counted in the apportionment.
 
 Lummi Reef Net Fishing
 
 48
 The conflict between the Lummi Tribe and the non-treaty Indian reef net fishermen involves elements not found among the other tribes. Reef nets are installed at various locations in the Sound parallel to the shore line from about 250 yards from shore.[5] Locations differ greatly in their productivity. The technique of reef net fishing was developed by the Indians, who used nets between reefs close to shore. Modern reef netting is far more sophisticated, making use of artificial "reefs" and heavy equipment, and is practical in deeper waters farther from shore. The court found that the fish had been driven from shallower waters by the whites' use of fish traps, now illegal, and by the widespread use of other fishing gear in the areas formerly devoted to Indian reef nets.
 
 
 49
 Reef net fishermen by gentlemen's agreement retain exclusive occupancy of a given location until they sell or otherwise dispose of their equipment. The court found that all Lummi reef net fishermen had been squeezed out of the fishery. At present, therefore, a member of the Lummi Tribe can reef net in a profitable location only by purchasing, at considerable expense, a non-treaty Indian's fishing gear.
 
 
 50
 The district court found that the present reef net areas are within the usual and accustomed grounds and stations of the Lummi Indians, and that the Lummis had a right to an opportunity to fish in those areas. The court, however, deferred for later consideration the specific relief to be afforded the Lummis at the expense of present occupants of reef net locations.
 
 
 51
 Reef net fishing is distinguishable from other forms of fishing in two important respects. First, only a finite number of profitable positions are available, each occupied at present by a white fisherman who is recognized by his fellow fishermen as owning a quasi-property interest in the site, an interest appurtenant to his ownership of his fishing gear. Any assignment of positions to treaty Indian fishermen must break down the present exclusive occupancy system. Second, and more important, the court found that:
 
 
 52
 Reef net locations were owned (at the time of the treaty) by individuals who claimed proprietary rights by virtue of inheritance in the male line. These locations constituted very valuable properties to their native owners. . . . Some of the Lummi signers of the treaty were owners of reef net locations. Lummi Indians who were present at the Point Elliott Treaty Council later asserted that the Lummi signers had received assurances there that they would continue to hold the rights to their fishing grounds and stations, including their reef net locations.
 
 
 53
 384 F.Supp. at 361. The right to fish with reef nets was thus not a tribal right, as was other fishing, but one guaranteed to specific individuals.
 
 
 54
 The individual Indian's proprietary relationship with a specific reef net location presents an aberration from the general communal pattern of Indian property ownership. Nevertheless, the Treaty of Point Elliott must be interpreted with reference to the general pattern of ownership among the tribes subscribing to it, not to the aberrational.
 
 
 55
 The fact that, in general, Indians held property communally has led the courts to hold that property rights, vis-a-vis the United States, are vested in the tribe not in the individual. Disputes among members of the tribe are left for the tribe to adjust internally. See Whitefoot v. United States,293 F.2d 658, 661-63 & nn. 8 & 9, 155 Ct.Cl. 127 (1961), cert. denied,369 U.S. 818, 82 S.Ct. 629, 7 L.Ed.2d 784 (1962).[6] In Whitefoot, for example, scarcity of good fishing locations at Celilo Falls on the Columbia river presented a similar situation. There, also, individual Indians had exercised an exclusive, hereditary right to fish certain choice locations. Nevertheless, the Court of Claims held that damages for inundation of the falls by federal construction of a dam were recoverable only by the tribe, not by individual tribal members. Similarly, no matter how Lummi fishermen held reef net locations according to tribal custom, so far as the United States is concerned, under the treaty the right to engage in reef net fishing belongs to the Lummi tribe. Therefore, fishing in the usual and accustomed reef net areas is subject to the same principle of equal division as is that in other usual and accustomed areas.
 
 
 56
 The non-Indian reef net fishermen maintain that today's fishing areas are not part of the Lummis' usual and accustomed areas. They assert that present reef netting is conducted in deeper water than that fished by the Lummis before the treaty was signed. The court, on the other hand, found that some present-day reef net gear is located directly upon traditional sites. It held that the "Lummi Tribe continues to hold treaty-secured rights to fish with reef net gear in its usual and accustomed places, including Legoe Bay off Lummi Island . . .." 384 F.Supp. at 404. The court also found that:
 
 
 57
 Since the turn of the century, the heavier volume of fish in the vicinity of Legoe Bay traveled close to shore. This has changed so that now fish must be taken in deeper water. This has been caused by the installation of traps (until they became illegal under state law) and the present abundance of other fishing gear in the reef net area. . . . In aboriginal times, Indian fishermen, like all fishermen, shifted to those locales that seemed most productive at any given time, including operation of the reef nets.
 
 
 58
 Id. at 361-62. Insofar as the district court thus concluded that usual and accustomed grounds and stations extended a sufficient distance from shore into Legoe Bay to enable the Indians to harvest most productively the available fish, that finding is not clearly erroneous. The term "grounds" as used in the treaties denotes a broader dimension than "stations" and can readily be understood to include the distances from shore at which present reef netting is done.
 
 
 59
 In fashioning equitable relief for the Lummis, the district court should give regard wherever practicable to minimizing the resulting hardship to present white reef net fishermen.
 
 Muckleshoot Tribe
 
 60
 The Muckleshoot Indian Reservation, named after the prairie on which it is located, was established in 1857, two years after the treaties were signed. It was occupied by Indians who earlier had been represented at Medicine Creek and at Point Elliott, as well as by some Indians who apparently were parties to neither of those treaties. The reservation was an arbitrary grouping; no Muckleshoot Tribe had previously existed. Nevertheless, the inhabitants of the reservation today are recognized as a tribe by the United States. The district court recognized the Muckleshoots as a treaty tribe. We agree.
 
 
 61
 The state refused to recognize membership in the tribe as conferring federal treaty rights. The Washington Supreme Court has held that a member of the Muckleshoot Tribe must establish that he is descended from a tribe or band which was represented at the signing of one of the treaties if he is to be accorded treaty rights. State v. Moses, 70 Wash.2d 282, 422 P.2d 775, appeal dismissed, 389 U.S. 428, 88 S.Ct. 577, 19 L.Ed.2d 654 (1967).
 
 
 62
 The Interior Department instructed Governor Stevens "to effect (if possible) the combination of all the Bands into six or eight Tribes, (and) to arrange half a dozen treaties or less, so that every one of the Tribes shall be a party to one of them." Exhibit USA 28. In the Treaty of Medicine Creek, 10 Stat. 1132, the tribes ceded all the land from the divide between the Puyallup and Dwamish rivers south to the Skookumchuck river, from the Sound to the crest of the Cascades. In the Treaty of Point Elliott, 12 Stat. 927, they ceded the land from the northern boundary of the territory ceded at Medicine Creek north to the Canadian border. Governor Stevens clearly believed that, except for those lands designated as reservations, he had successfully acquired the territorial rights of all the tribes in that vast area; and the district court found that the government has consistently treated the present-day Muckleshoot Tribe as the successor in interest of those of its constituent tribes which had been represented in the two treaties.
 
 
 63
 The state's principal fear seems to be that members of the Muckleshoot Tribe will be able to use the traditional areas of all the merged tribes, affording them special rights. The argument is specious. The member of every tribe composed of smaller bands possesses rights similarly more extensive than those of any one of his direct ancestors. The treaty Indians are restricted to the opportunity to take up to 50 percent of the harvestable catch at traditional areas. Each Indian can fish at but one location at a time, so that the state's concern that he is accorded double the treaty rights to which he is entitled is unfounded.
 
 Stillaguamish and Upper Skagit Tribes
 
 64
 The Stillaguamish and Upper Skagit Tribes were parties to the Treaty of Point Elliott, but today are not recognized as organized tribes by the federal government. Rights under the treaties vested with the tribes at the time of the signing of the treaties. Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine. Cf. Upper Chehalis Tribe v. United States, 155 F.Supp. 226, 140 Ct.Cl. 192 (1957). Once a tribe is determined to be a party to a treaty, its rights under that treaty may be lost only by unequivocal action of Congress. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Evidence supported the court's findings that the members of the two tribes are descendants of treaty signatories and have maintained tribal organizations. We therefore affirm the district court's conclusion that the Stillaguamish and Upper Skagit Tribes are entities possessing rights under the Treaty of Point Elliott.
 
 Conclusion
 
 65
 The decision of the district court is affirmed in all respects, with the clarification that its "equitable adjustment" should not take account of fish caught by non-Washington citizens outside the state's jurisdiction. The case is remanded to the district court so that it may maintain continuing jurisdiction.
 
 
 66
 Affirmed and remanded.
 
 BURNS, District Judge (concurring):
 
 67
 I concur, but I want to add a brief comment from the viewpoint of a district judge. As was suggested at oral argument, any decision by us to affirm also involves ratification of the role of the district judge as a "perpetual fishmaster." Although I recognize that district judges cannot escape their constitutional responsibilities, however unusual and continuing duties imposed upon them, I deplore situations that make it necessary for us to become enduring managers of the fisheries, forests, and highways, to say nothing of school districts, police departments, and so on. The record in this case, and the history set forth in the Puyallup and Antoine cases, among others, make it crystal clear that it has been recalcitrance of Washington State officials (and their vocal non-Indian commercial and sports fishing allies) which produced the denial of Indian rights requiring intervention by the district court. This responsibility should neither escape notice nor be forgotten.
 
 
 
 *
 The Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 "Other citizens" includes a substantial number of citizens of Indian ancestry who are no longer enrolled members of treaty tribes
 
 
 [2]
 The tribes have contended on appeal that the state may not regulate their fishing activities at treaty locations for any reason. Their assertion is foreclosed by the decision in Puyallup Tribe of Indians v. Dept. of Game of Washington, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968)
 
 
 [3]
 The Supreme Court observed that "the State must demonstrate that its regulation is a reasonable and necessary conservation measure . . . and that its application to the Indians is necessary in the interest of conservation." Antoine, 420 U.S. 207, 95 S.Ct. at 952 (emphasis by the Court). This limitation on the state's police power is nullified in practice when, as here, a court has ordered an apportionment of the opportunity to take the harvestable run. By apportioning between treaty Indians and other citizens the opportunity to take all fish not needed for escapement, the court in effect requires treaty Indians to contribute to preservation of the run. To do so deprives the Indians of no rights. Both treaty Indians and other citizens share responsibility, as quasi-cotenants, for the run's perpetuation. In Antoine, the Court denied the state's power to compel the treaty tribes to assist in assuring optimum escapement; it did not question the tribes' moral or equitable duty to do so. The tribes have come to court seeking equity in allocation of the harvestable catch; the court may first require them to fulfill their equitable responsibility to allow sufficient escapement
 
 
 [4]
 In Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916), the Court rejected a concept of "dual sovereignty" by which the state would regulate non-Indians exclusively, and the tribe, Indians. The Court held that such a duality would be unworkable; either entity would be able to destroy the resource, free of check by the other. Id. at 563, 36 S.Ct. 705. Neither the Settler panel nor we advocate such a duality. The tribe possesses a power of enforcement inferable from its power to regulate. Settler (507 F.2d at 238). This power does not displace that of the state; ordinarily the state and the tribe possess concurrent power to regulate Indian fishing at usual and accustomed sites so far as necessary to preserve the run. However, the district court has enjoined the state's exercise of its power in order to advance the congressional policy of promoting tribal autonomy. If tribal self-regulation proves impracticable, we are certain that the court will revise this feature of its judgment
 
 
 [5]
 This fact was determined from inspection of the aerial photographs admitted by the district court as exhibits RN 7 and RN 11
 
 
 [6]
 The concept of "property" can scarcely exist outside a legal framework. We are reluctant to force whatever notions of rights and duties regarding fishing locations were held by Indians in 1854 into an Anglo-American mold of "property rights." We are especially reluctant to do so when the tribe still exists with which we can deal as an intermediary, allowing it to arbitrate among the conflicting claims of its members according to the values and customs of their own culture