**UNITED STATES of America et al., Plaintiffs,**

v.

**STATE OF MICHIGAN et al., Defendants.**

**No. M26–73 C.A.**

United States District Court, W. D. Michigan, N. D.

May 9, 1980.

James S. Brady, U. S. Atty., J. Terrance Dillon, Asst. U. S. Atty., Dept. of Justice, Grand Rapids, Mich., Elmer T. Nitzschke, Dept. of Interior, St. Paul, Minn., Bruce R. Greene, Native American Rights Fund, Boulder, Colo., William J. James, Legal Services, and Daniel T. Green, Sault Ste.

Marie Tribe Bay Mills Indian Community, Sault Ste. Marie, Mich., for plaintiffs.

Stewart H. Freeman and Gregory T. Taylor, Asst. Attys. Gen., Lansing, Mich., for defendants.

## OPINION

FOX, Senior District Judge.

On October 12, 1979, the State of Michigan filed a motion before this court for a partial stay of judgment pending the outcome of its appeal to the United States Court of Appeals for the Sixth Circuit. The motion was addressed to that portion of this court's May 7, 1979 declaration D.C., 471 F.Supp. 192, which held that the State lacked authority to regulate fishing by treaty tribe members in waters of the Great Lakes ceded under the Treaty of March 28, 1836 (7 Stat. 491). Included in the State's application was a proposal which indicated the concept of Indian regulation which it would impose if its stay were granted by this court.

The State argues in its motion that subsequent to this court's May 7, 1979 opinion, Indian fishing had increased tremendously causing irreparable harm to ". . . Lake Trout, Whitefish and other targeted species in the Michigan Waters of the Great Lakes."

The State also contends that "unlimited use of gill nets will ultimately lead to the collapse of the fisheries resource," that the conservation codes of the tribes' and the Secretary's regulations ". . . are nothing more than licenses allowing unlimited slaughter of Lake Trout, Whitefish, Coho Salmon, and other species," and that the Indian fishery is irreparably harming the recreational fishery.

The relief prayed for by the State is to allow it to regulate treaty fishers, pending the outcome of the appeal, consistent with an "Indian Fisheries Assistance and Development Proposal" set forth as an attachment to its brief.

The State has not based its motion on a challenge to this court's holding that the Michigan Indians retain the aboriginal right to fish in the ceded waters of the Great Lakes. This right is fully protected by the Constitution of the United States as the Supreme Law of the land. In evaluating the State's motion, this court is again obliged to implement the Constitution, on penalty of violating its oath:

> No one can deny that the constitution of the United States is the supreme law of the land; and consequently, no act of any state legislature, or of congress, which is repugnant to it, can be of any validity. Now, if an act of a state legislature be repugnant to the constitution of the state, the state court will declare it void; and if such act be repugnant to the constitution of the Union, or a law made under that constitution, which is declared to be the supreme law of the land, is it not equally void? And under such circumstances, *if this court should shrink from a discharge of their duty, in giving effect to the supreme law of the land, would they not violate their oath, prove traitors to the constitution and forfeit all just claim to public confidence?* *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 571–2, 8 L.Ed. 483 (1832) (McLean, J., concurring). (Emphasis supplied.)

## STANDARDS FOR A STAY PENDING APPEAL

■ To obtain a stay of a district court injunction pending an appeal, certain familiar tests must be met. The standard is set forth in *Virginia Petroleum Jobbers Ass'n. v. F.P.C.*, 259 F.2d 921 (D.C.Cir.1968), and may be paraphrased as follows:

(1) Has the petitioner made a strong showing that it is likely to prevail in the merits of the appeal?

(2) Has the petitioner shown that without such relief, it will be irreparably injured?

(3) Would the issuance of a stay substantially harm other parties interested in the proceedings?

(4) Where lies the public interest?

Before addressing these matters, a general word about the typical situation in which

a stay is granted is in order. The classic situation wherein a stay is granted pending appeal is when the moving party below has been successful and the requested relief will require the implementation of plans and expenditure of funds which cause major dislocation and change to the defendants.[1] For example, in the *Reserve* mining case (*Reserve Mining Co. v. United States*, 498 F.2d 1073 (8th Cir. 1974)), the plaintiff obtained an order requiring a major employer to cease polluting the air and water at the west end of Lake Superior. Because the district court's order could have resulted in a shut-down of Reserve's taconite mining operations, the resultant loss of hundreds of jobs by that area's largest employer, it was appropriate to stay that order and maintain the status quo pending appeal.

Similarly, the Court of Appeals for the Sixth Circuit has stayed the effect of a district court injunction requiring the integration of a large city school system for the same kind of reasons. Such an order forcing integration causes staggering dislocations in a school system and requires the expenditure of massive sums of money for busing and the like, and pending an appeal on the merits, the Appeals Court has, from time to time, issued stay orders. *Northcross v. Board of Education of Memphis City Schools*, 463 F.2d 329 (6th Cir. 1972). But *compare Northcross, supra*, with *Reed v. Rhodes*, 549 F. 1050 (6th Cir. 1976), where the entry of a stay by a single judge was vacated by a three-judge panel, in a school desegregation case.

Here, unlike the typical situation in which a stay might be appropriate, the State urges this court change radically the status quo of *no* State regulation to that of State regulation. In March 1977, the State filed a motion before this court to compel the United States to issue identification cards to treaty-right fishermen under 25 C.F.R. Part 256. The State argued that there were many fishermen claiming to be Indian who in fact were not and, therefore, should be fishing subject to State rules and regulations. The United States responded in a brief which took the position that it could not be compelled legally to issue those identification cards, but nonetheless was willing to do so to assist the State in dealing with the fisherman identity problem. (*See* Transcript of Hearing held April 7, 1977.) Subsequent to that hearing, the United States issued so-called "256 cards" to treaty-right fishermen which were signed by the particular tribal chairman and a representative of the Bureau of Indian Affairs. Thereafter, the State voluntarily agreed not to impose its fishing rules and regulations on any card-carrying tribal member.[2]

As recently as October 25, 1979, counsel for the State of Michigan stated to this court:

> [By Mr. Gregory T. Taylor] And, the United States has endorsed and the State of Michigan has accepted during the pendency of this case the 256 card method, and that is the method that was also employed by Congress.
>
> * * * * * *
>
> . . . and I represent to the Court on the record if and when the members of this organization [referring to the Grand Traverse Band of Ottawa and Chippewa Indians] are recognized and receive 256 cards they will not be arrested. Until that time, they are subject to arrest under state law.

Transcript of Hearing on Motion for Temporary Restraining Order, *United States v. Michigan*, Civ. No. M26–73, pp. 20 and 24, October 25, 1979.

---

1. Generally, such relief is preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit.

 *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977).

2. In the State's Motion to Compel the United States of America to Issue Indian Identification Cards, dated March 21, 1977, paragraph 8 provides:

 If the Court does issue such Order, the State Defendants will not arrest, or attempt to enforce its fishing laws and regulations, against any Indian validly holding such identification card, during the pendency of this action.

■ It is clear then that at least since the Spring of 1977, the status quo has been *no* state regulation of treaty-right fishermen who are properly identified and who fish in compliance with applicable tribal fishing regulations. By seeking a partial stay before this court, the State is asking that the status quo be turned one hundred eighty degrees to allow them to regulate treaty fishers pending the outcome of the appeal, something they have not done for over three years. The purpose of a stay is to preserve, not change, the status quo pending the outcome of an appeal.

## LIKELIHOOD OF SUCCESS ON APPEAL

The State indicated its likelihood of success on appeal is predicated upon the "*Puyallup* line of cases and *Washington v. Fishing Vessel Ass'n* [443 U.S. 658, 99 S.Ct. 3055], 61 L.Ed.2d 823 (1979)."

■ This court considered the *Puyallup* line of cases in its Judgment of May 7, 1979 and will not reanalyze it here. Suffice it to say that this court declared that the restricted state regulation of Indiana treaty fishers permitted in that line of cases can only be understood in terms of the language of the underlying treaties limiting the Indians' reserved right to fish to a right "in common with all citizens of the territory," a limitation explicitly imposed after negotiations. Justice Douglas focused upon this language in initially declaring Washington's right to regulate its Indians:

> ˙Moreover, the right to fish at those respective [usual and accustomed] places is not an exclusive one. Rather it is one "in common with all citizens of the territory." Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State. *Puyallup Tribe v. Department of Game*, 391 U.S. 392 at 398, 88 S.Ct. 1725 at 1728, 20 L.Ed.2d 689.

Where the Indians' right to fish is held in common with all other citizens of the territory by virtue of specific treaty language, Justice Douglas saw that there is no reason to prevent the State from regulating the Indians in common with its other citizens, even if only by distinct, appropriate regulations. In contrast, the Indians of Michigan presently hold an unabridged, aboriginal, tribal right to fish derived from thousands of years of occupancy and use of the fishery of the waters of Michigan. That aboriginal right arose from the tribes' reliance upon the fishery for its livelihood, that is, from its dependence upon this fishery for food and trade. This right was confirmed in its entirety by the Treaty of Ghent and left whole by the Treaties of 1836 (7 Stat. 459) and 1855 (11 Stat. 621). Thus, today the Michigan tribes retain the right to fish Michigan treaty waters to the full extent necessary to meet the tribal members' needs.

■ As noted in *United States v. Washington*, 384 F.Supp. 312, 342 (E.D.Wash. 1974), "*any regulation will restrict the exercise of a right guaranteed by the United States Constitution.*" In Michigan, this court found, the negotiators for the United States did not raise the issue of Indian fishing rights, preferring instead to leave the Indians with the impression that those rights would not be qualified after the treaty. The United States displayed indifference about getting the Indians' fishing right; indeed, appeared willing to leave the right with the Indians rather than raise a former point of contention with them. When the court in *People v. LeBlanc*, 399 Mich. 31, 248 N.W.2d 199 (1976), authorized restricted state regulation similar to that authorized in Washington, it did so only after declaring that the right of the Michigan Indians is "in fact" a right held "in common with" non-treaty citizens. The holding of *People v. LeBlanc* ignores the negotiations of the Michigan treaty and its terms, a not surprising outcome since that court did not have the benefit of the factual record developed in this court. Since the Indians' right to fish is not limited by the Michigan treaty, the Indians do not hold the right "in common with all other citizens of the territory" and the State may not restrict the exercise of a right guaranteed by

the United States Constitution by regulating the exercise of that right. To permit the State to do so would usurp a prerogative of the United States and undermine, in the case of those tribes which are exercising adequate self regulation, the Congressional policy of fostering Indian sovereignty.

This court has not yet evaluated what impact *Washington v. Fishing Vessel Ass'n, supra,* might have on this case. The basis for the State's claim that it enhances the likelihood of success on appeal is its holding that the fishing right of Indians, where the right is held in common with the citizens of the territory, is limited to so much of the fish as is necessary to provide the Indians with a moderate livelihood.

*Fishing Vessel Ass'n* is an allocation, not a regulation case. However, its principles support the position that the State's authority to regulate treaty right fishing is not the same in Michigan as it is in Washington.

*Fishing Vessel Ass'n* relies upon *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), and *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1903). Both involved implicit reservations of previously held aboriginal water rights. *Fishing Vessel Ass'n* modifies these cases to the extent that it measures the Indian fishing right in terms of changing needs and numbers of Indians. The Supreme Court illustrated this principle by considering the right of the Indians as decreasing over time, as fewer Indians participate in the aboriginal fishery and achieve their moderate standard of living from a lesser percentage of the total available catch. The Court could not display this principle except on the hypothesis of a declining fishery, because Indians in Washington presently have only a right to an opportunity to catch 45–50% of the available catch, and it can never go higher. This 50% maximum arises directly from the "in common with" language in the Washington treaties. 443 U.S. 686, 99 S.Ct. 3075, 61 L.Ed.2d 846. The 50% ceiling is suggested, if not necessarily dictated by, the word "common" as it appears in the Washington

treaties. No such language is present in the Michigan treaties. 443 U.S. at 686 n.27, 99 S.Ct. at 3075 n.27, 61 L.Ed.2d at 846 n.27.

The general principle in *Fishing Vessel* is that Indian treaty rights to scarce natural resources are defined by what is necessary to assure that the Indians' reasonable livelihood expectations are met. 443 U.S. at 686, 99 S.Ct. at 3075, 61 L.Ed.2d at 846. Where, as here, there was no negotiation resulting in a right held in common and the Indians implicitly reserved their aboriginal right in its entirety, this principle might, over time, mandate that the Indians have access to the entire available resource. While the reasoning in *Fishing Vessel Ass'n* indicates that other citizens of the state might have access to resources left over after the Indian needs are satisfied, this is not because the right of the Indians is held "in common with" them, but because the characteristics of the aboriginal, use right.

The non-treaty access of the State to the resource does not appear to give the *State* sufficient interest to render the *state* police power adequate to prevent the lake trout from following the fate of the passenger pigeon. *Puyallup II,* 414 U.S. 44 at 49, 94 S.Ct. 330 at 333, 38 L.Ed.2d 254. Any limitation of the right to the needs of the Indians or limitation of the catch to what is available for harvest must be effected by the federal government or the tribes themselves. The co-tenancy analogy relied upon by the Ninth Circuit to rationalize the fishery allocation and to describe the enforceable rights of treaty and non-treaty fishermen, *United States v. Washington,* 520 F.2d 676 (9th Cir. 1975), no longer works here, because the State can find no basis on which to assert a right of its own. There is no common asset for Solomon to divide, because only one party, the Indians, has an enforceable right. In *Washington,* where the right of the Indians is limited by the "in common with all other citizens of the territory" language, the citizens of the State can be said to have a "privilege" to fish. This reflects their quasi co-tenancy. The "privilege" of Michigan citizens is wholly residual, and arises only beyond the demands of the Indians' unabridged aboriginal rights.

*IRREPARABLE HARM TO THE RE-SOURCE*

### A. Introduction.

If the State is to prevail in this motion, it must meet the burden of showing that unless this court's Judgment of May 7, 1979 is stayed, it, or the resource, will suffer irreparable harm.

■ Not every loss of fish can be deemed irreparable harm. Legally cognizable harm must be identified in terms of applicable legal standards. Those standards are expressed in a series of Supreme Court decisions which deal with state regulation of treaty fishermen.

### B. Standards governing irreparable harm.

In *Puyallup Tribe v. Department of Game (Puyallup I)*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), the Court stated that regulation of treaty right fishing is permissible, in the interest of conservation, if the regulation meets appropriate standards and does not discriminate against the Indians.

■ The Supreme Court of Washington subsequently thought that this holding permitted the State to prohibit Indian gill net fishing and to limit the steelhead catch to a hook and line fishery, belonging to sports fishermen. Indians could fish by hook and line, like all other citizens. In review of the State Court, the United States Supreme Court clarified the meaning of discriminatory regulation. The Court ruled:

> There is discrimination here because all Indian net fishing is barred and only hook-and-line fishing entirely pre-empted by non-Indians is allowed. *Department of Game v. Puyallup Tribe (Puyallup II)*, 414 U.S. 44, at 48, 94 S.Ct. 330, at 333, 38 L.Ed.2d 254.

It is not enough that the Indians be given an opportunity to fish like all other citizens. They must be permitted to take their portion of the catch by their traditional means.

The Court also stated in *Puyallup II* that a state may not simply carry out its preferred management plan where this interferes with federally protected aboriginal rights. 414 U.S. at 48, 94 S.Ct. at 333. The Ninth Circuit subsequently applied this principle in denying the State the right to enforce its conservation program against Indian fishermen:

> The state's program for management of the state's fisheries may appear sound and commendable, but the state shares its rights in those fisheries with another party. It may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens. The state must pursue its goals as best it can by regulating its own non-treaty Indian citizens. 520 F.2d at 686.

■ In *Puyallup II* the Court also outlines the standards of conservation governing non-discriminatory regulations: the treaty fishing right is not unlimited. "The treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." 414 U.S. at 49, 94 S.Ct. at 334. The rights may be controlled by the need to conserve a species. If necessary to assure a species of survival, Indian, along with non-Indian fishing, may be banned. 414 U.S. at 49, 94 S.Ct. at 333. Such biological imperatives are expressed in the most dire terms—the survival of a species, not the preservation of a species for non-Indian fishermen or for the economic benefit of the State.

■ The "appropriate standards" required of non-discriminatory regulations must meet two criteria: (1) the regulation must be a reasonable and necessary conservation measure, and (2) its application to the Indians must be necessary in the interest of conservation. *Antoine v. Washington*, 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129.

The meaning of the first of these criteria is set out in *United States v. Washington*, 384 F.Supp. at 342. "Reasonable" means that a specifically identified conservation measure is appropriate to its purpose; and "necessary" means that such purpose, in addition to being reasonable, must be essential to conservation.

■ Even more significant is the second of the above criteria: it must be *necessary* to regulate the Indians. *United States v. Washington, supra,* says of this standard:

> If alternative means and methods of regulation and necessary conservation are available, the state cannot lawfully restrict the exercise of off-reservation treaty right fishing, even if the only alternatives are restriction of fishing by non-treaty fishermen, either commercially or otherwise, to the full extent necessary for conservation of fish.

384 F.Supp. at 342. The Ninth Circuit commented in the following language:

> Direct regulation of treaty Indian fishing in the interests of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power jurisdiction. *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1975).

520 F.2d at 686. To regulate Indian fishermen first, to apply the same regulations to them as to non-treaty fishermen, is to render the treaty rights nugatory. *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *United States v. Washington,* 520 F.2d at 686.

Allocation is a procedure which, in effect, nullifies the above limitations on treaty right regulation by requiring treaty Indians to contribute to the preservation of the run in the first instance. *See, United States v. Washington,* 520 F.2d at 686 n. 3. When courts are engaged in allocation of fish in Washington rivers (where there is a self-sustaining population which is augmented by planted fish), the norm used to identify fish available for harvest is the numbers of fish necessary to assure maximum escapement. A standard which refers to escapement is not useful in the Great Lakes where non-andronomous fish are under consideration.

Cases decided by the lower courts since the above standards were worked out are not helpful to the effort to give them greater specificity in the context of the Great Lakes. *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199, generally adopts the standards set out above and rejects the State's efforts merely to implement its preferred management plan. The court held that the defendant's conviction for fishing with a gill net could be upheld only if:

> (1) The prohibition of the gill net is necessary for the preservation of the fish protected by the regulation;
> (2) the application of this prohibition to the Chippewas is necessary for the preservation of the fish protected; and
> (3) the regulation does not discriminate against the Chippewas.

399 Mich. at 64, 248 N.W.2d at 215. Recognizing that the "conservation of a species" standard of *Puyallup II* cannot be understood in terms of "the preservation of a run" for Great Lakes, non-andronomous species, the Michigan Supreme Court attempts to adopt it to the Great Lakes context. "Conservation" becomes "preservation of the fish protected." This can hardly be understood to mean "for the preservation of individual fish caught." The Court does not help in understanding what else is meant, except that it is clear from the context that it means to do no more or less than apply the *Puyallup* standard to the Great Lakes.

*State v. Gurnoe,* 53 Wis.2d 390, 192 N.W.2d 892 (1972), formulated a standard which, when interpreted in terms of fisheries management concepts, strays from the *Puyallup* standard. "Conservation" becomes "prevention of substantial depletion of the fish supply." Such a formulation could be invoked to deprive Indians of their treaty rights long before a threat to the species develops. All that is necessary is that a utilitarian concept of conservation be invoked to preserve the fishery for the greatest number of citizens. Such a concept can be employed to exclude the Indians from a fishery altogether by defining in terms of the needs of sports fishermen, rather than of the protected species.

■ Besides the *Puyallup* standards protecting species from destruction, and Indians from discriminatory and unnecessary regulation, there is another standard which

prevents state regulation where conservation requirements are otherwise satisfied. Congressional policy fosters Indian self-rule. *United States v. Michigan*, 471 F.Supp. 192 (W.D.Mich.1979). In view of this, the right of Indians to regulate their own fishermen is protected. *United States v. Washington*, 384 F.Supp. 312; *United States v. Washington*, 520 F.2d 676. To the same effect is *People v. Jondreau*, 384 Mich. 539, 185 N.W.2d 375 (1971). In that case the treaty in question provided a mechanism for federal regulation of Chippewa fishing rights (direct Presidential intervention), and the State Supreme Court held that this provision for federal regulation prevented direct state regulation of the fishing rights.

### C. The State's Presentation of Evidence.

Very little of the State's case here is presented in view of these standards. The State declares that it is necessary for it to ban Indian gill net fishing for conservation purposes. Some of the supporting evidence is couched in terms of alleged destruction of "spawning stock" of lake trout. In certain areas of the Great Lakes, these claims are colorable. However, when it is recognized that "spawning stock" is little more than a name given to lake trout which, subsequent to the State's planting program which ensures widely distributed lake trout populations, have grown to a length of about 25 inches or more and a weight variously described as six or seven pounds, it becomes appropriate to focus upon the stated conservation objectives more carefully. The fact is, almost none of these fish reproduce and preservation of the species in the Great Lakes depends wholly upon the State stocking program.

The Director of the State Department of Natural Resources defined "conservation" in a utilitarian fashion as "management of a resource for the greatest good for the greatest number for the longest period of time." Keller and Wright indicated their allegiance to this definition as well. Preservation of a species is not required by this concept, and may even be incompatible with it, as when protection of an endangered species is judged to be too expensive. In fact, this concept of conservation may also be incompatible with other goals of the Department of Natural Resources expressed by its director: a quality environment and biological protection. Yet, it is this concept of conservation which the State invokes to justify its objectives here: exclusion of Indian fishermen from access to the lake trout population, or to any other fish allocated to sportsmen or state licensed commercial fishermen, and denial to them of their traditional methods of fishing. Indian fishermen should presently be excluded from the lake trout harvest and denied the use of the gill net, the State says, in the interest of conservation and to prevent depletion.

The State declares that good conservation requires allocation of the lake trout to sports fishermen only, a clear discrimination against the Indians. Almost all lake trout presently in the Great Lakes are planted. The return on the investment in hatchery reared trout, if caught by sportsmen, is 17–1, computed in terms of the state and federal cost of the international, federal hatchery program and the total expenditure by sportsmen for goods, services and licenses within the State. Sports fishermen allegedly expend 350 million dollars annually within the State. From the testimony, it appears that some percentage, less than 35% of this total figure, is generated by lake trout fishermen. The precise return from the lake trout sports program is not critical here, however. It is simply necessary to contrast it with the return to the State if the entire planted lake trout population were allocated to the Indian fishermen, whose dockside catch is worth two to four million dollars. The return would then "approach" 1 to 1. By the State's understanding, the greatest good for the greatest number requires allocation to the sports fishermen. It is, however, absolutely clear that this is discrimination against the Indians.

As stated by Director Tanner, the present factor limiting the lake trout catch to sportsmen is economic, not biological, be-

cause the present trout population is derived from hatchery bred fish. This appears to fly in the face of his claim that economic considerations, allocation among user groups, is permissible only after biological demands have been satisfied. Perhaps what this reveals is that the Department of Natural Resources believes that biological necessities for survival of the lake trout are satisfied by the present planting program, if the take is properly limited, as it allegedly is by allocation to sportsmen. However, other testimony indicated that the sports catch is mandated by the fact that public monies are being spent on the rehabilitation program, (principally federal monies, but apparently the public does not make such a distinction). While this latter testimony takes away from the inference that the sports catch is compatible with rehabilitation, it adds weight to the contention that rehabilitation cannot be called a realistic goal at the present time.

Lake trout are central to the State's rationale for banning the gill net. Trout were once a mainstay of the Michigan commercial fishing industry, and the Great Lakes were managed for the commercial fisherman. However, in the middle 1960's the State adopted a major change in management goals, deciding to devote the Great Lakes to the angler. Management choices are now made in favor of the recreational fishery. Accordingly, the Department of Natural Resources banned the gill net to protect the fishery for the angler. The State licensed whitefish fishermen had to adopt gear which would enhance the possibility of releasing lake trout. When a fisherman uses a gill net to catch whitefish, he almost of necessity captures lake trout, since they tend to be in the same waters and the net discriminates only to a limited degree. The trout are then brought to the surface dead and cannot be released. Almost whenever a gill net is used, it will catch lake trout. The State does not want any commercial fisherman, treaty or non-treaty, to retain lake trout. They have been allocated to sports fishermen.

Under the State's definition of conservation, allocation of trout to sportsmen would be necessary, even if catch limits were biologically defined. Such allocation would still generate greater returns than allocation to Indian fishermen, so long as those returns are measured in terms of total funds generated for the general population of Michigan.

Much of the State's additional testimony was aimed at establishing "depletion" in areas where gill netting occurs. The concept of "depletion" has the ring of a condition where fish stocks have been destroyed or can no longer sustain themselves, a natural condition having been overcome by human activity. In fact, the lake trout population in the Great Lakes was virtually nonexistent after 1950. Present populations are almost wholly artificially propagated. The new depletion of which the State speaks is defined in terms of this population and has little reference to whether the stock can sustain itself. Depletion is now defined in terms of a population which is sustained by plantings.

As expressed by Dr. Tanner, the condition of depletion which the State alleges here must be understood against the following background: the State's objective is to attain the maximum *preferred* levels of *harvest* (emphasis supplied). It seeks to maximize the return on the fishery, to continue the stock in a given condition and to enhance it. Given this background, depletion focuses upon the harvest aspects of the above objectives. It is defined as "excessive" withdrawal, withdrawal which injures the ability to enhance or maintain the current level of production.

Under this definition depletion arises very quickly where the fish population is allocated to sportsmen. In order to maintain the present sports harvest, it is necessary to maintain a high level of abundance. Sports fishing gear, Dr. Tanner reported, is less efficient than commercial fishing gear. An area where there is not a sufficient level of abundance for a sportsman to continue his enterprise might yet contain sufficient fish for the commercial fisherman. The area would not be depleted for the commer-

cial fisherman; his harvest would continue. It was necessary for the State to speak of "sports depletion" and "commercial depletion."

Under this definition depletion does not exist—even if the fish are entirely unable to sustain themselves—so long as the levels of harvest can be maintained, even if artificially.

Another indication that the State did not formulate its case in biological terms appears in its condemnation of the gill net. Dr. Tanner commented on the fact that gill nets are widely used on the West Coast and in the Great Lakes off Wisconsin, Minnesota and Ontario, saying that the use of a gill net is consistent with a commercial fishery, but not with a recreational fishery. Such a finding is reported in *United States v. Washington* :

> The Director of the Game Department believes that an Indian net fishery for steelhead would be detrimental to the recreational fishery but not necessarily detrimental to the resource itself. 384 F.Supp. at 393

Where there is no sport fishery pressure, Tanner said, arguments in favor of the gill net as a cheap, efficient instrument might prevail. The Canadian waters of Lake Superior are fished with gill nets by commercial fishermen, apparently without harm to the stocks, because Ontario has chosen to focus upon inland sports fishing and leave the Great Lakes to commercial fishermen. The Director succinctly stated: "The conflict is sports—commercial fishing." This conflict is to be resolved, he said, by the principles of good conservation—the economic concept outlined above. It requires that Indians take only available fish *not sought by sportsmen*, and, in the State's effort to avoid disruption of the present fishery, fish *not presently allocated* to state-licensed commercial fishermen.

As expressed by Dr. Tanner, the gill net is, in final analysis, an inexpensive, efficient method of taking fish, well suited to a fishery made up of individuals with only limited capital on which to base their efforts to make a livelihood. The limited capital requirement supports conservation by permitting a reasonable income on the basis of a smaller withdrawal from the fishery. The State's plan for the commercial fishery appears to engineer in all of the "efficiencies" of the modern corporate farm, the substitution of capital for skill and individual labor.

But, the lucidity of Dr. Tanner's testimony on the merits of the gill net was rare. All of the State's witnesses were employees of the Department of Natural Resources who testified under the scrutiny of their peers. Some of them were instrumental in the adoption of the initial ban on gill netting in the early seventies. All are obviously committed to the implementation of the present policy. Their testimony often had the ring of a public relations effort, seasoned by many presentations to community groups and intended to rally public support in order to influence the legislature. It was clear that the State's witnesses were guided by attitudes as much as by evidence.[3] Even when Dr. Scott attempted to speak for the previous witnesses and explained that they were not trying to say that the gill net is simply bad, he could not avoid admitting that in a close case, where either a trawl or a gill net might be used to fish and where many of the vices of a gill net would be duplicated—such as killing the fish—he would still prefer the trawl. At that point his reason appeared to be a desire to protect other recreational activities. The professed reason for not choosing the gill net was the fact that it would be in the water longer.

Attitudes and commitment were obvious in another context as well. Witness Haas presented data showing relative frequencies with which a gill net incidentally catches various inch classes of lake trout. This evidence was presented without regard to the characteristics of the population from which the samples were taken. Haas relied

---

**3.** Given this history and the character of the testimony here, the Indians might well ask whether the State defendant's promise to go to the state legislature to ask for funds to support an Indian changeover to entrapment gear is a hollow promise.

on the resulting tables to support the general conclusion that the gill net is non-selective with respect to size of lake trout, even though each size of net displays characteristic frequencies of catch which witness Berg revealed are statistically significant. Further, when questioned as to the frequency of various sizes of lake trout which might be expected incidental to a whitefish fishery in a hypothetical population (described by the court), Haas was unwilling to make any estimate of the likely percentage of lake trout caught over 21 inches—because he did not know the population. He could not even say whether fish over 21 inches would make up over 50% of the catch. Just before Haas' testimony, witness Keller effectively testified that he believes all lake trout caught in such a population can be considered the equivalent of 21 inches or over, and in his affidavit he considers the entire catch to be 25 inches or over. Haas' evasiveness when faced with the hypothetical question posed by the court appeared to be an effort to avoid taking exception to the position taken in his colleague's testimony and affidavits.

In view of the non-selective character of the gill net, as testified to by Haas and admitted by Keller in a different context, I find Keller's claim that the gill net is so selective in Grand Traverse Bay that you can consider all trout caught there to be 25 inches or over incredible. Even if the average fish caught is 6–7 pounds, the error of attributing to every member of the sample the average characteristics of the same is an elementary statistical error. Accordingly, his testimony that there has been a 50% depletion of "spawning stock" there is also incredible.

The court observed this sort of commitment to policy and position coloring the testimony of nearly every witness. The State's position is that a gill net fishery is inconsistent with rehabilitation of the lake trout. Yet, each witness would declare that some harvest, the present sport harvest, is permissible and not inconsistent with the present rehabilitation effort, even though it sometimes alone exceeds the allowable catch for a self-sustaining fish stock. Each would acknowledge that there are factors affecting the selectivity of the nets, yet despair of regulations according to these factors. Quotas might be imposed to limit the incidental catch, making the gill net fishery impossible after the quota is caught. Yet, this avenue was systematically ignored by the witnesses. Areas might be closed to protect endangered stocks. This too was ignored.

The ambiguity of the State's evidence that lake trout cannot be restored alongside a gill net fishery is also illustrated by the testimony of Asa Wright. Mr. Wright testified that gill net fisheries, first the state licensed commercial fisheries of the 60's and 70's—which continue up to the present time—and then Indian fisheries of the later 70's, are inconsistent with the lake trout rehabilitation program. Part of the evidence for this is that self-sustaining stocks have not developed where gill netting occurred and a trend toward a spawning population was reversed with increased gill net pressure in Whitefish Bay. This draws attention away from the fact that spawning has only occurred in parts of Lake Superior and in one, artificially constructed, area of Grand Traverse Bay, despite years of efforts. Always this evidence is weakened by the fact that early populations were established as a result of massive plantings which the State terminates, or nearly terminates, whenever gill netting occurs, thereby bringing about even greater reduction of the population.[4] Also, under the State's present stocking program, the stocks will never again be artificially raised to the levels which existed when the early gill net fishing took place. If the numbers of trout originally released must be maintained before spawning can take place, then nothing the State asks here will provide for it, since the State does not plan to plant at those levels, but plans to plant available numbers

4. The total population could be sustained if the federal-state planting program engaged in massive plantings.

of fish throughout the entire Great Lakes. If earlier high levels need not be maintained, then there was no harm to the rehabilitation by the mere removal of the excessive number of fish. The State's present planting program effectively removes far more trout than have the Indian fishermen. Always the evidence is further limited to the outcome of initial planting efforts where the levels of survival are likely to vary unpredictably because of the habitat change since lake trout last occupied an area and because first plantings must carry the entire lamprey load.

Mr. Wright's testimony was permeated with the fundamental ambiguity of the State's case. It never became clear to the court whether he intended to express the opinion that preferred levels of natural reproduction will never take place alongside a gill net fishery, or that no amount of planting can ever result in any natural reproduction so long as gill net fishery exists. From Mr. Keller's testimony it appears that it is the preferred level which is threatened. When asked whether a 50% reduction of the "spawning stock" from Grand Traverse Bay would make natural reproduction impossible, he was hesitant to say it would.

It is clear from the above that the *State simply did not formulate its case in terms of the standard of conservation relevant when Indian rights are to be regulated.* The Supreme Court has outlined a biological concept of conservation and rejected state efforts to maintain its preferred management program. *Puyallup II.* Nevertheless, this court will attempt to evaluate the evidence before it in terms of the appropriate criteria. At the end of this review it will be apparent that in evaluating the State's claim that the Indian gill net fishery is inconsistent with maintenance of the stock of lake trout in the treaty waters, this court is able to paraphrase Judge Boldt: The near total absence of substantial evidence to support [this claim] was a considerable surprise to this court. *See, United States v. Washington,* 384 F.Supp. at 339.

### D. Analysis of Specific Zones:

#### (i) Zones MM–1 and MM–2.

The treaty waters of Michigan are divided into several zones which facilitate statistical analysis. All parties relied upon these divisions to present their case.

The State did not significantly rely upon the character of Indian fishing in zones MM–1 and MM–2 in its effort to establish its case. Zone MM–1 is made up of the Michigan waters of Northeastern Lake Michigan from the Wisconsin Border on Green Bay to a line from Point Detour to the easternmost point of the Northern Michigan-Wisconsin Border. Zone MM–2 covers the Michigan waters of the Northern shore of Lake Michigan from a line from Point Detour to the Northern Michigan-Wisconsin Border to a line drawn south from Port Inland to a line drawn west from Norwood.

The State contended that the lake trout population there has been destroyed by state licensed gill netters fishing pursuant to state court order. This is so much the case that witnesses found nothing extraordinary about the minimal reported incidental lake trout catch, even though almost 900,000 pounds of whitefish were taken from Zone MM–1 by state licensees alone. Indian records reveal a take of 27,817 pounds of whitefish and 26,707 pounds of lake trout from the same zone. (Relying on wholesale reports, the State would place the figures at 70,031 and 950, respectively, for the Indian catch.) The allowable catch of whitefish in Zone MM–1 set by the Ad Hoc Working Group is 960,000 pounds. But, the State can find none that are available for Indian fishermen, and in its proposal allocates them only 50,000 pounds of perch. To permit any Indian to take other than this would "disrupt" the present, permissible fishery, the State contends.

In its proposal the State allocates 200,000 pounds of whitefish to the Indian fishermen from Zone MM–2 and authorizes a chub fishery which is presently prohibited. The State's answers to interrogatories do not indicate a licensed whitefish take in the

area. Indian catch reports reveal a take of 30,899 pounds of lake trout and 42,177 pounds of whitefish from MM–2. (The State's wholesale figures would place the take of lake trout at 107,282 and whitefish at 108,617.)

Evidence presented to the court raised the possibility that the incidental lake trout catch of state licensed fishermen is finding its way to the wholesale market as Indian-caught fish.

(ii) *Zone MM–3.*

Zone MM–3 is bounded on the west by a line drawn from Gulliver Lake on the northern shore of Lake Michigan to the Michigan-Wisconsin line, on the east by the Mackinac Bridge, and on the south by a line from the northeast corner of the Michigan-Wisconsin boundary across the northern-most tip of the Leelanau Peninsula to an intersection with the east shore of the mouth of Grand Traverse Bay. The history of Zone MM–3 was presented to this court largely as evidence of the incompatibility of the gill net with lake trout restoration. It might better be taken as evidence of the need to develop suitable habitat before successful restoration is possible.

The 1965 stocking is reported to have been the principal part of 1.4 million fish— (1 million). In 1968, probably the first year of vulnerability to the gill net, a "large" incidental catch of 49,000 lake trout were caught by state licensed commercial fishermen. By 1971, the 65 planting was extinct. If it is assumed that the "large" incidental catch of 49,000 was taken from the 1965 planting each of the three years before extinction, the 1 million fish were rendered extinct by a catch of 147,000. It becomes worse than implausible to assert that only the gill net could be responsible for the extinction of the plant.

The 1966 planting showed greater stamina, some members surviving until nine years of age. Nevertheless, the State regarded the incidental catch as unacceptable and drastically curtailed plantings in the early 1970's—even after it had banned the gill net in the area and inaugurated a zone management plan.

Zone MM–3 provides no evidence of irreparable harm on the part of the plaintiff tribes, unless in the past year. The gill net fishery of the late 60's and early 70's used to display the horror of the gill net in Zone MM–3 was state licensed. The charge made against Indian fishermen is that the Catch Per Effort (C.P.E.) index used to evaluate the status of the stocks went down 59% from 1977 to 1979, the period of Indian fishing. Interpreted most favorably to the State, this is evidence that the fish stock has gone down. Not to be overlooked is the fact that the stock as a whole was effectively reduced by the economic policy decision not to continue planting at the rate employed in the 60's. This decision effectively removed more fish from the present stock than has Indian fishing. The reduction in rate is likely caused by the dying off of early plantings, the effects of reduced plantings and the failure of the stock to reproduce.

Another point which northern MM–3 illustrates is the futility of the State's effort to provide for a large whitefish catch by gill nets in the midst of its rehabilitation program. Put another way, its zoning was not radical enough to prevent the incidental catches of lake trout which it professes was necessary to its rehabilitation program. If it had been guided by its desire to protect the lake trout so as to build up a self-sustaining stock, it would have prevented gill netting altogether, rather than trying to reap an economic return from the whitefish at the same time. The suggested procedure has been adopted by the tribes on Zone MH–1.

(iii) *Zone MM–4.*

Zone MM–4 is that portion of Grand Traverse Bay lying south of a line drawn from the Grand Traverse Lighthouse on the northern point of the Leelanau Peninsula due east to a point near Norwood, Michigan.

Not only was the impact of Indian gill netting in Zone MM–4 the subject of dis-

pute, but even the quantity of fish taken. The testimony and affidavit of witness Keller were the principal sources of these difficulties.

Keller proposed that the total catch from Zone MM–4 can be determined by taking 90% of the estimated total for Zones MM–3 and MM–4. The estimated total is supposedly derived directly from state monitoring reports, augmented only by an estimate of the total number of days each of the fishermen observed during the monitoring actually fished.

The estimated number of days for which each fisherman fished appears on Keller's Attachment A to his affidavit in support of the State's motion as "No of lifts." Overall, the estimates are 2.6 times the number of observed lifts. In other words, 39% of the lifts said to have occurred were monitored (Keller said 50% were). As few as 13% of the alleged lifts of a plaintiff tribe during a two-week period were monitored; as many as 62% during others. The number of lift days remains curiously constant throughout the two-week periods and is generally set at six, except for one two-week period in September, where it is set at 4, supposedly because of inclement weather, and one time in July where units of the Sault tribe allegedly fished for only four days. This curiosity is heightened by the fact that the Indian row boat fishermen are highly mobile and many do not fish full time.

Each of the estimated units allegedly fished within the assigned zone every one of these lift days. Witness Wright avoided dividing his estimate of the total catch for the northern zones of the Lower Peninsula between statistical zones for the very reason which Keller's methodology appears to ignore: the fishermen moved around too much to assign them to one or another zone. The number of feet of net fished by the estimated number of units is assigned to each unit for each day it is estimated it fished.

The estimated total catch of each tribe is derived by multiplying the estimated total lifts by the "average" catch for each estimated lift. This procedure surely cannot give rise to new information. There are three supposed unknowns here: total catch, number of lifts, and average catch per lift. If total catch and number of lifts are known (or reasonably estimated), the average catch per lift can be determined. The estimates of total lifts here appear to assume that each observed unit continued to fish in the same place during the times they were not monitored. If total catch is unknown, which it must be if new information is sought, the "average catch" is but another estimate, perhaps based on observations during inspections. But, it is not responsible to extrapolate from the average catch during inspections to the catch during every hypothetical lift. The tables display too great a variation in the supposed average catch and in the proportion of lake trout to whitefish. For each two-week period a single ratio of lake trout to whitefish is assigned to each tribe and ascribed to every additional lift. It varies for successive week periods by as much as 450% within a single grouping of Indians. And, within two-week groupings, the plaintiffs here allegedly took up to 10 percentage points difference in percentage of lake trout. The catch per effort (calculated in pounds) assigned to the various groupings differs within two-week periods for a single plaintiff tribe by up to 350%.

Another curious aspect of Keller's testimony is that he did not focus upon the gill net tugs referred to in paragraph 16 of his affidavit. Paragraph 16 was clearly intended to create the impression that the tug catch was additional and separate from the catch reported in paragraph 15 and attachment A. Yet, even in Attachment A there is a footnote referring to large gill net tugs, indicating that the fishing effort of those tugs is included in the figures of the Attachment and paragraph 15 of the affidavit. Where they are included, nothing which would add up to the 41,000 pounds of lake trout and 212,000 pounds of whitefish ascribed to them in paragraph 16 appears, the total catch of the Ottawas during the footnoted period being set at 4,416 and 12,288

for each species, respectively. (The Ottawas are not parties here, this title being reserved by Keller for a group of Indians other than the Grand Traverse Band.) If the figures for the September 16–30 period include monitored tugs and yet reveal so small a catch, the inflated estimates for the "six large tugs" in paragraph 16 is wholly mystifying, and, despite the protestation that only half were monitored, it is likely that the estimates for the tugs in paragraph 16 involve the same sort of extrapolation described above when discussing Attachment A generally.

Were it not for the general unreliability of Witness Keller's testimony, I would make greater effort to place the catch described in paragraph 16 either within or without the figures in paragraph 15. The catch reported by wholesalers is of little additional help because Keller admitted that the reported purchases can be ascribed to the area only on the basis of monitoring reports, an interpretation involving the same sorts of judgments described above.

The only useful figures are those provided by the Bureau of Indian Affairs. They are based upon the sort of data which the State calls "the most reliable in the world" when supplied by its licensed fishermen. In addition, use of these figures avoids having to exclude the fish caught by Keller's "Ottawa" classification. The Bureau of Indian Affairs figures indicate that, as of September 30, 1979, members of the plaintiff tribes had caught 88,930 pounds of lake trout and 309,665 pounds of whitefish in Zone MM–4.

Keller made the claim, startling on its face, that a 50% depletion of lake trout spawning stock had taken place in Grand Traverse Bay by August 30. It must first be recognized that a 50% reduction of the spawning stock per year was not regarded as outrageous by the Ad Hoc Working Group. In fact, such a reduction was considered as a management option permitting maximum harvest consistent with maintaining an ongoing spawning population. The State manages Zones MM–5, 6 and 7, and MH–1 without regard for this 50% set aside. Keller's affidavit reports that 96,000 pounds of trout 25 inches or over would constitute half of the spawning stock in Grand Traverse Bay. In fact, only a total of 88,930 pounds of fish of all sizes was taken. From the testimony of Haas regarding the nonselectivity of gill nets, far less than 100% of these fish would be 25 inches or over. (Assessment catches indicate that from 40–94% of the lake trout caught in Grand Traverse Bay have been of this size during the five years ending in 1978). Because the Indian trout were taken with gill nets, the only effective limit on the size of the catch was the vulnerability of the trout to the gill net, a size much closer to 17 inches than to 25. According to the Ad Hoc Working Group, where the take extends to trout of only 17 inches, only 100,880 pounds of trout result in a 50% reduction of spawning stock. Keller's statement that a 96,000 pound take would reduce the spawning stock by 50% is taken from figures of the Ad Hoc Working Group which assumes that only fish 25 inches or longer are kept. The 88,930 pound catch withdrawn from Grand Traverse Bay by September 30 would reduce the spawning stock by about 40% rather than the 50% reported by Keller by August 30.

Keller stated that he believed a 50% reduction would seriously harm the spawning stock but would not render spawning impossible. There was no evidence that a 40% reduction would render spawning impossible. The Ad Hoc Working Group regarded a 50% reduction as acceptable.[5]

5. Keller submitted substantially the same evidence as he provided here to a Grand Traverse County Circuit Court in August of last year. This evidence was submitted by way of affidavit on behalf of private parties who challenged Indian fishing as in violation of state environmental protection law. Not having the benefit of the cross-examination of this witness or evidence indicating that the fish stock in Grand Traverse Bay was not actually in jeopardy as a result of Indian fishing, the state circuit court entered a preliminary injunction which had the effect of excluding the Indians from the available catch of lake trout and whitefish in the area, a clear end run around constitutionally protected rights declared by this court.

Judge Boldt, faced with such hostile flanking movements in the state courts attacking his

decision concerning the fisheries in Washington, wrote the following decision, 459 F.Supp. 1020, 1028 (W.D.Wash.1978), which was appealed and affirmed in *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979):

DECISION, INJUNCTION AND ORDER RE STATE COURT INJUNCTIONS PREVENTING ENFORCEMENT OF CERTAIN DEPARTMENT OF FISHERIES REGULATIONS
(September 12, 1974)

Paragraph 5 of the Interim Plan and Stay Order entered by this court on March 22, 1974 (384 F.Supp. at 420), obligates defendants State of Washington, Washington Department of Game and its Director and Washington Department of Fisheries and its Director, (hereinafter "defendants") to make significant reductions in the non-Indian fishery as deemed necessary to achieve the objectives of the court's definition of Indian treaty fishing rights. In carrying out this order the court anticipated that defendants would promulgate and enforce regulations reducing the non-Indian fishery. Defendants have promulgated certain regulations establishing reductions in the non-Indian fishery but have been unable to enforce them by reason of certain directives and orders of the Thurston County Superior Court in *Washington State Commercial Passenger Fishing Vessel Association v. Tollefson*, No. 50380, *Washington Kelpers Association v. Tollefson*, No. 50552 and *Puget Sound Gillnetters Association v. Tollefson*, No. 50757.

No additional or alternative regulations have been proposed by defendants. Therefore, it now appears that in order to effectuate the prior orders of this court and to preserve this court's jurisdiction over the subject matter, further orders of this court are necessary to clarify the scope of the court's jurisdiction and of the duties imposed upon defendants under Final Decision # 1.

[1–5] The principal questions presented by plaintiffs' request are whether this court is empowered to protect its earlier rulings from incursions such as have taken place in the three state court proceedings referred to above and, if such jurisdiction exists, whether this court in its discretion should exercise said authority, and if so, in what form. This court fully adopts the legal arguments recited in Exhibit "A" attached to this order [3] as though fully set forth herein and refers particularly to the following cases cited therein: *Atlantic Coast Line; Thomason; Shelton; Donelon; Leiter Minerals; Alonzo v. U. S.; U. S. v. Wood.* Based upon the legal arguments and decisions referred to immediately above, this court is not only satisfied that it has jurisdiction to enjoin the state court proceedings referred to, within the express exceptions to the anti-injunction statute, 28 U.S.C. § 2283, but also believes it has an urgent duty to take such action to the extent shown necessary in order to effectuate its judgment and protect the federal treaty rights declared therein.

[3] Exhibit A was a portion of Plaintiffs' brief and is summarized as follows:

The regulations and actions at issue here represent attempts by the state to conform to Paragraph 5 of the Interim Plan and Stay Order obligating them to make "significant reductions" in the non-Indian fishery in order to achieve Indian opportunities. By restraining such obligated reductions, the state court preliminary injunctions directly conflict with this court's earlier rulings. The questions now before this court are whether this court is empowered to protect its earlier rulings from such past and future incursions and, if so, by what means.

The power of the court to defend its judgments, even to the extent of restraining inconsistent state directives, is not seriously in doubt. This court has retained continuing jurisdiction to assure compliance with its judgment and decree. Conclusion of Law # 48 (384 F.Supp. at 405). That jurisdiction extends if necessary to staying state court judges.

The apparent clashes between state and federal courts presented here have been an inescapable ingredient of a dual court system since the early days of the Republic. *See* C. Wright, Law of Federal Courts, § 47 (2d Ed. 1970). Federal courts are reluctant to interfere with state court adjudications, a policy familiar and persuasive to this court. But the policy is one of restraint, not abdication. It is expressed today in the "anti-injunction statute," 28 U.S.C. § 2283:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

Section 2283 is not a jurisdictional statute as such, but rather is am embodiment of long-established principles of comity. *E. g., Hale v. Bimco Trading Co.*, 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939); *Smith v. Apple*, 264 U.S. 274, 44 S.Ct. 311, 68 L.Ed. 678 (1925); *Wells Fargo and Company v. Taylor*, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920). Thus, the statute, its exceptions, and case law interpreting it are useful vehicles for discussing the court's powers in this case.

A. *A Federal Court May Act where Necessary in Aid of its Jurisdiction or to Protect or Effectuate its Judgments*

More than four years ago this court assumed jurisdiction over the question of what obligations the State of Washington owed to Indian tribes under the fishing rights provisions in the federal treaties. Final Decision # 1 made clear the obligation of the state to take action to assure treaty Indians an opportunity to harvest a greater number of fish in order to effect an equal sharing consistent with the language and intent of the treaties. This court specifically ordered the defendants to make reductions in

non-Indian fishing. Thus, this court has assumed jurisdiction over the subject matter which nonparties have attempted to bring before the state courts. And it has rendered decisions and orders which would be effectively frustrated by the state courts' inconsistent injunctive orders. This presents a clear case of violation of comity principles where a federal court can and must act to preserve its jurisdiction and to assure that its rulings will have meaning and will be heeded. The exceptions to the comity doctrine and to section 2283 "imply that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970).

Cases are legion which affirm the exercise of a federal court's power to prevent state court action from interfering with federal jurisdiction and from undermining federal court judgments. Many of these cases arose in situations such as the present where a federal court had forged remedies to protect the rights under federal law of a disadvantaged minority, only to be called upon immediately to *defend its judgment from hostile flanking movements in the state courts.* An example is *Thomason v. Cooper*, 254 F.2d 808 (8th Cir. 1958) where the federal court enjoined use of a state court injunction that had been obtained to prevent a school board from enrolling white children in an integrated school to carry out earlier federal court integration order. *Accord, Grenchik v. Mandel*, 373 F.Supp. 1298 (D.Md.1973); *United States v. Texas*, 356 F.Supp. 469 (E.D.Tex.1972).

In *Montgomery County Board of Education v. Shelton*, 327 F.Supp. 811 (N.D.Miss.1971) a federal court, having limited protest activities during school hours, later enjoined a more restrictive ex parte state court decree secured by nonparties to the federal action. The federal court said that "the effect of the state injunction will be to undermine and interfere with the prior orders of this court and to limit our flexibility in dealing with the multiple and complex problems which almost inevitably arise in the wake of school desegregation." 327 F.Supp. at 815. *See also, Coffey v. Braddy*, 372 F.Supp. at 116 (M.D.Fla.1971) (federal court order regarding hiring practices in local fire department; attorney enjoined from pursuing sanctions for failure to comply with subsequently entered state court injunction); *Concerned Consumers League v. O'Neill*, 371 F.Supp. 644 (E.D.Wis. 1974) (federal injunction in consumer picketing controversy issued directly against state court judge although state court action was first in time).

Labor disputes also have occasioned conflicts between federal and state adjudications. In *National Labor Relations Board v. Nash-Finch Co.*, 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971), the Supreme Court upheld a federal injunction sought by the National Labor Relations Board to restrain enforcement of a state court antipicketing order secured by the company before the federal agency acted on the union's unfair labor practice charges. *Accord, National Labor Relations Board v. Sunshine Mining Co.*, 125 F.2d 757 (9th Cir. 1942) (granting injunction sought by NLRB restraining persons from further prosecuting state court actions laying claim to funds payable to employees as back pay under federal court order).

Federal court injunctions also have been issued to effectuate judgments in cases outside of the sphere of major social conflicts. *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108 (5th Cir. 1973), upheld an injunction to prevent relitigation of issues pertaining to track maintenance under the Federal Railroad Safety Act. The court explained: "While § 2283 was designed to ensure the state courts' adjudicative potency, its exceptions assure that the federal courts and their judgments will not be eunochized and that their muscularity will not be atrophied." 474 F.2d at 1114. See also *Teas v. Twentieth Century-Fox Film Corp.*, 413 F.2d 1263 (5th Cir. 1969) (party enjoined from proceeding with state court suit in order to protect federal judgment awarding one-half of the royalties under an oil and gas lease); *Miller v. Climax Molybdenum Co.*, 96 F.2d 254 (10th Cir. 1938) (prosecution of state court suits affecting railroad properties in a way likely to threaten an ICC order enjoined); *Fresno v. Edmonston*, 131 F.Supp. 421 (S.D.Cal.1955) (state water rights proceedings enjoined on the theory, among others, that the "res" of the dispute was before the federal court).

We have here no unseemly race to the courthouse such as often characterizes efforts to enjoin pending or threatened state prosecutions. *Compare Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (granting injunction), with *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (denying injunction). This is a case where "the enjoining court, having previously adjudicated the case on the merits, would seem * * * in a better position to determine the extent and nature of duplication." Comment, 32 *U.Chi.L. Rev.*, 471, 474 n.17 (1965).

That which was so carefully decided by this court is hastily being undone by a series of proceedings hardly resembling contested cases. Each injunction issued has been without security and thus in clear violation of state law. See *Irwin v. Estes*, 77 Wash.2d 285, 461 P.2d 875 (1969); *Evar, Inc. v. Kurbitz*, 77 Wash.2d 948, 468 P.2d 677 (1970); RCW 7.40.080. In each case the state has virtually conceded the irreparable injury necessary for a preliminary injunction. Given the summary decision-making and leisurely pace towards any trial on the merits, these state injunctions effectively will determine whether there will be any significant re-

strictions on the non-Indian fishery in the coming year as decreed by this court. For all practical purposes the federal decision is facing suspension for another year without so much as a single witness being subjected to cross-examination in the state courts.

B. *Federal Statutes Furnish a Basis for the Court's Action*

There are at least two statutory authorizations for the type of order sought by plaintiffs. First, the All Writs Act, 28 U.S.C. § 1651, authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." This authorization extends to granting injunctions against state adjudicative proceedings. *Public Utilities Commission v. United Fuel Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed.2d 396 (1943); *Fresno v. Edmonston, supra.*

A second statutory basis for an injunction is found in the civil rights acts. The court, in part, is exercising its jurisdiction under 28 U.S.C. § 1343(3) and (4) to redress the deprivation, under color of state law, of rights secured by the Constitution, laws and treaties of the United States. Under 42 U.S.C. § 1983 the remedy available for such deprivations includes equitable relief. The Supreme Court has held that 42 U.S.C. § 1983 is within the "expressly authorized" exception to 28 U.S.C. § 2283. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

C. *The United States and Indian Tribes Assert Superior Federal Interests Which Override the Comity Principle*

The United States, together with the plaintiff tribes, has initiated this request to protect the court's rulings from the interference of inconsistent state court directives. The Supreme Court has held that where an injunction is sought by the federal government, the inhibitions of § 2283 vanish. The purpose according to the Court, is "not to hamstring the Federal Government and its agencies in the use of federal courts to protect federal rights." *National Labor Relations Board v. Nash-Finch Co., supra.* The origins of this federal government exception to § 2283 are traceable to *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 225–226, 77 S.Ct. 287, 290, 1 L.Ed.2d 267 (1957), where Mr. Justice Frankfurter said:

"The statute [§ 2283] is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings except under the severe restrictions of 28 U.S.C. § 2283 would be so great that we cannot reasonably impute such a purpose to Congress from the general language of § 2283 alone."

As stated in *United States v. Wood*, 295 F.2d 772, 783 (5th Cir. 1961), *cert. denied* 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962):

"Where the United States has instituted the suit we must assume that the considered judgment of the Attorney General has concluded that a violation of the national interest has taken place.

Here the United States, which stands in a guardian-ward relationship to Indians, has acted in pursuit of its special duties to protect their treaty fishing rights. Enforcement of such rights is a national goal of the highest order and clearly is a "superior federal interest." *See* President's Message to Congress, July 18, 1970.

In *Alonzo v. United States*, 249 F.2d 189 (10th Cir. 1957), *cert. denied* 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958), a federal district court enjoined prior state court proceedings against an Indian tribe and its officers involving rights to lands held by the tribe in restricted fee. The court of appeals upheld the federal court injunction under the superior federal interest doctrine of *Leiter*, finding that "since the United States is suing as a guardian of a dependent nation in discharge of a fiduciary duty, its right and duty to protect the interests of its wards may be even greater than it would be if it were suing in its own behalf with respect to its own lands." 249 F.2d at 197.

Superior federal interests have justified injunctions in many other contexts. *E. g., United States v. Barrett*, 442 F.2d 642, 646 (4th Cir. 1971) (Federal Housing Act); *Brown v. Wright*, 137 F.2d 484 (4th Cir. 1943) (rent control); *United States v. Wood, supra* (voter registration).

The same reasoning that exempts federal plaintiffs from application of normal comity rules applies to Indian tribes. These tribes are not merely private parties in the sense that other civil litigants are. They appear here under 28 U.S.C. § 1362 as parties to treaties made with the United States. They are "distinct political communities," *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832), and stand in relation to the United States as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1837). As a consequence, they have many attributes of sovereignty. For instance, they possess immunity from suits to which they do not consent in federal and state courts. *See United States v. U. S. F. & G. Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Thebo v. Choctaw Nation*, 66 F. 372, 375 (8th Cir. 1895).

The legislative history of 28 U.S.C. § 1362 shows that it was intended to permit Indian tribes to litigate issues in federal court on the same basis as if the government had instituted the action. See H.R.Rep.No. 2040, 89th Cong., 2d Sess. (1966) quoted in part in *Moses v. Kinnear*, 490 F.2d 21, 25 n.9 (9th Cir. 1973).

Recognizing this status of Indian tribes, the courts have applied the so-called "co-plaintiff"

rule to allow the tribes to stand in the shoes of the government for various purposes if they properly might have been co-plaintiffs with the United States. The Ninth Circuit Court of Appeals has applied this rule to allow suits by Indian tribes to enjoin assessment of state taxes which are prohibited from being brought by private parties under 28 U.S.C. § 1341, on the same basis that such suits are permitted when the United States is plaintiff. *Moses v. Kinnear, supra; Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184, 1186 (9th Cir. 1971), *cert. denied* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). *See also, Walker v. River Paiute Tribe v. Sheehan*, 370 F.Supp. 816, 821 (D.Nev.1973). *Cf. United States v. Ahtanum Irrig. Dist.*, 236 F.2d 321 (9th Cir. 1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367, 330 F.2d 897 (9th Cir. 1964), 338 F.2d 307 (9th Cir. 1964), *cert. denied*, 381 U.S. 924, 85 S.Ct. 1558, 14 L.Ed.2d 683, in which the court found that Indian property rights could not be lost through laches or estoppel.

Because Indian tribes possess the essential aspects of sovereignty, normal consideration of comity applicable to private litigants do not apply to such tribes. As such, the co-plaintiff rule should apply and the federal anti-injunction statute, 28 U.S.C. § 2283, should be no bar to the requested injunctive relief. *See National Labor Relations Board v. Nash-Finch Co., supra; Leiter Minerals v. United States, supra*, 352 U.S. at 220–225, 77 S.Ct. 287.

The matter of this court's power to act under the circumstances as well as the need for such action are beyond question. The only issue is how best to exercise the court's authority to protect the federal judgment with a minimum of friction.

[6] It is clear beyond reasonable question that the three state court injunctions referred to above have to some extent prevented defendants from complying with this court's order to make "significant reductions" in the non-Indian fishery in order to make available to treaty-right fishermen a sufficient portion of the harvestable resource to guarantee an opportunity for them to harvest 50% of said resource. Interference with the exercise of Indian treaty fishing rights indisputably is within the jurisdiction of this federal court, and state court proceedings instituted by nonparties to this lawsuit cannot be allowed to frustrate either final determinations based on exhaustive research and evidence or the jurisdiction of this federal court.

Data submitted by the United States Fish and Wildlife Service, which includes Department of Fisheries statistics, indicate that through August 1974, with the exception of the Nisqually River chum harvest in January which, for management purposes would be considered part of the 1973 run, Indian fishermen in the case area in 1974 have caught less salmon of each species than they caught in 1973, both in terms of total numbers of fish caught and in terms of the percentages of Indian harvest as contrasted with total non-Indian commercial salmon, or 3.5% of the total as compared with 3,404,710 salmon harvested by non-Indian commercial interests; through August of 1974, Indians have harvested 89,402 salmon or 2.4% of the total as compared with 3,628,513 salmon harvested by non-Indian commercial fishermen; when the sport catch through August of 1974 of 837,099 salmon is included, the Indian share of the total harvest is 2.0%.

These figures illustrate in the most startling manner the gross inequities between Indian and non-Indian harvest, and the complete failure and inability of defendants to comply with this court's orders to make significant reductions in non-Indian fishing and to afford to Indians an opportunity to catch approximately 50% of the harvestable resource at their usual and accustomed grounds and stations. Because by their nature substantial fish resources will be lost for 1974 to plaintiff tribes if not harvested during the currently ongoing seasons, the immediate threat of substantial economic harm and serious hardship to many treaty-right fishermen convinces this court that prompt action is required to protect federal treaty rights that this court has found are constitutionally guaranteed as the law of the land and to assure the viability of this court's Final Decision # 1, unless and until it be modified or reversed.

In all court litigation in which the United States has an interest, including cases involving the interpretation and application of treaties duly enacted as required by federal law and the national Constitution, the Attorney General of the United States, acting through the Justice Department and United States Attorneys, is the official authorized to speak and act for the people of the Nation in such matters. In this instance, the United States Attorney, presumptively in the national interest, has requested that this court enjoin enforcement of the injunctions issued in all three of the above-referred to state court proceedings. Plaintiff tribes, as descendants of signatories to treaties with the United States, have joined in that request.

Rather than consider the state court proceedings in toto, upon the record now presented this court finds it necessary to consider the injunctions separately and therefore will discuss each of them in the order of issuance. It must be recognized, however, that each of the three state court proceedings was instituted by litigants none of whom was a party to this federal court action. Additionally, none of those state court proceedings joined the United States or the plaintiff tribes, the real parties in interest who could be, if not irreparably, at a minimum grievously, injured by state court injunctions preventing enforcement of the Department of Fisheries regulations promulgated for the express purpose of making more fish

That the treaty catch was incremental upon the sports catch is not cognizable in these proceedings. This condition is wholly within the State's control. It is discriminatory to regulate the Indians but not the sportsmen, and unnecessary to stop Indian fishing until after the sportsmen have been stopped.

Although continued fishing at the rate evidenced this summer in Zone MM–4 might well call for increased tribal regulation, the record of the tribes in conservation matters, evidenced by their closing of Zone MH–1, indicates that should the present rate pose a threat to the stocks in Zone MM–4, the tribes can be expected to take appropriate steps to limit the take.

The appropriate whitefish withdrawal from MM–4 during 1979 was set at 50,000 pounds for purposes of an experimental fishery. In the State's proposed Indian fishery, an annual withdrawal of 100,000 pounds is set, the proposal having been presented to this court after the Indian fishing of last summer and presumably taking it into account. It is evident that in the State's estimation the stocks there remain in a condition which will support continued harvest. The 309,665 pounds of whitefish withdrawn by September 30, 1979 are outside the proposed sustained yield, but do not appear to have been excessive for a fishery which had been closed to commercial exploitation for years and which had a fish population dominated by abnormal numbers of larger, adult fish.

(iv) *Zones MM–5, –6 and –7.*

Zone MM–5 consists of those waters of Lake Michigan west of Grand Traverse Bay and south of the line drawn west from Norwood to a line drawn west from Arcadia. MM–6 includes the waters of Lake Michigan south of a line drawn west from Arcadia to a line drawn west from Little Sable Point. MM–7 is made up of the waters of Lake Michigan south of a line drawn west from Little Sable Point to a line drawn west from Holland, Michigan.

The State did not allege that Indian fishermen are depleting the stocks of lake trout in Zones MM–5, –6 and –7. Almost no Indian fishing takes place there. No natural reproduction of lake trout takes place in these zones.

Witness Keller indicated that the sportsmen's withdrawals of lake trout in these zones are not inconsistent with natural reproduction. In fact, however, the estimated sports catch of lake trout in these areas during 1979, reduced by the factor of 5.5 recently adopted by the State, amounted to: Zone MM–5, 57,731 pounds; MM–6, 188,400

available to treaty-right fishermen. Finally, at none of the state court hearings were witnesses interrogated nor was any of the hearings a full scale evidentiary hearing; only affidavits of the litigants were presented, not subject to cross-examination, and the state court judges could only act upon the materials presented to them.

Beyond question, the state court judges who issued the restraining orders involved herein performed their judicial functions in accordance with established law and practice in the state courts, and in an able and responsible manner beyond criticism in any particular whatever. However, it is clear from the cited authorities that the circumstances above recited can and should be considered by this court together with the full record before it, significant portions of which were not available to the state courts, in determining what action, if any, to take with regard to these state court proceedings.

459 F.Supp. 1028–33 (W.D.Wash.1978).

The above order of Judge Boldt enforcing reductions of the non-Indian catch by 50% were subsequently approved by the Supreme Court, Justice Stevens declaring that non-party actions before the state courts must not be allowed to stand in the way of federal court enforcement of its decrees.

"State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution.

\* \* \* \* \* \*

The federal court unquestionably has the power to enter various orders that state officials and private parties have chosen to ignore, and even to displace local enforcement of those orders if necessary to remedy the violations of federal law found by the court . . . .. Even if those orders may have been erroneous in some respects, all parties have an unequivocal obligation to obey them while they remain in effect."

*Washington v. Fishing Vessel Ass'n,* 443 U.S. at 695–696, 99 S.Ct. at 3079–3080, 61 L.Ed.2d at 851–52.

pounds, and MM–7, 151,780 pounds. These 1979 figures duplicate the 1978 catch figures. Witness Kutkuhn, relying upon the Ad Hoc technical report off Lake Michigan, revealed that in Zone MM–6, 55,000 pounds would be the maximum take allowing for sustainability and a 121,000 pound withdrawal would amount to a put/grow/take fishery, a fishery sustained solely by planting. In Zone MM–7 a 35,000 pound catch would allow a self-sustaining population. A catch of 84,000 pounds would render the fishery put, grow and take. The sports catch exceeds even this. The State calls this fishery fully regulated. Zone MM–5 also exceeds the self-sustainability figures.

It would appear that the State of Michigan is fully willing to permit withdrawal of lake trout which prevents natural reproduction so long as that withdrawal is performed by non-Indians and so long as there is sufficient economic return.

#### (v) *Zone MH–1.*

Zone MH–1 covers the Michigan waters of northern Lake Huron south to a line drawn perpendicular to the International Boundary from Rogers City.

The State began stocking Zone MH–1 in 1973. The area was the focus of an intensive Indian fishery in the fall of 1978 and the spring of 1979, a time when the Indians, as a result of political pressure, had a self-imposed ban on fishing in Lake Michigan below Cross Village, and before allowable catch determinations had been established for the area. After this catch, the Ad Hoc Working Group determined that 3,000 pounds of trout were available under the put, grow and take option. Nevertheless, the Secretary and the tribes closed this area to all Indian fishing indefinitely, and the ban is expected to be permanent. The State has not closed this area to sports fishermen, and estimates their catch for 1979 at 25,180 pounds. Dr. Kutkuhn testified that the State is managing this area on a put, grow and take basis. Despite this, during these proceedings, the State attempted to hold the Indian fishermen to the self-sustaining stock standard and to take

the size of their catch as inconsistent with the State's goals.

State licensed commercial fishermen took 405,550 pounds of whitefish from this zone by September 30, 1979. Indian catch reports reveal a take of 178,948 pounds. The State's proposal offers the Indians 100,000 pounds of whitefish. The total allowable catch determined by the Ad Hoc Working Group is 550,000 pounds.

#### (vi) *Zone MH–2.*

Zone MH–2 covers Michigan waters of Lake Huron between lines drawn perpendicular to the International Boundary from Rogers City and Black River.

Little Indian fishing is taking place in Zone MH–2. Indian fishermen took 1,100 pounds of lake trout and 5 pounds of whitefish in 1979. Non-Indian fishermen took 80,384 pounds of whitefish and sportsmen took 22,545 pounds of lake trout. All totals are well within allowable catches. Lake trout are available here: 84,000 pounds to permit a self-sustaining stock and 123,000 pounds for a put, grow and take fishery. However, the State's proposal would ban the Indians from any take of lake trout and allocate them 100,000 pounds of whitefish.

#### (vii) *Zones MS–4 and –5.*

Zone MS–4 covers the Michigan waters of Lake Superior from a line running from Salmon Trout Point out to the International Boundary to a line drawn north from Beaver Lake. Zone MS–5 is made up of the Michigan waters from Lake Superior between lines drawn north from Crisp Point and from Beaver Lake.

Indian fishing for lake trout and whitefish in Zones MS–4 and MS–5 is negligible. However, the state commercial whitefish take from MS–5 appears to be excessive.

Indian fishermen took 35,102 pounds of trout from MS–4 and 90 pounds from MS–5 in 1979. Sustained yield in MS–4 would permit a 118,000 pound take and MS–5 a 29,000 pound take. State-authorized fishermen took 8,363 pounds of lake trout from MS–5.

In MS–4 Indian fishermen took 22,064 pounds of whitefish; non-Indians 37,829 pounds. The allowable catch is 10,000 pounds. In MS–5 Indians took 138,176 pounds; non-Indians 54,143 pounds. The allowable catch is 200,000 pounds.

The State proposes to protect these stocks by permitting the Indian fishermen to take 100,000 pounds of lake trout from MS–5. The only other catch permitted would be herring and chubs. Here the Indians would not even be allowed to fish for whitefish.

(viii) *Zone MS–6.*

Zone MS–6 is roughly equivalent to the Michigan waters of Whitefish Bay, although it extends west to a line drawn north from Crisp Point to the International border.

The State claimed that lake trout in MS–6 are in a state of depletion because of intensive Indian gill netting which began in the fall of 1974.

Planting of lake trout began in MS–6 in 1962. Until 1973 plantings reportedly averaged 200,000 in Whitefish Bay alone. After that, the plantings were reduced to 100,000 in 1974, and then to less than 30,000 for the following three years.

The State's case against Indian gill netting is based upon a decline in the assessment fishing index, the C.P.E., from 1974 to 1975, and a decline in the total catch by licensed commercial fishermen.

The declining catch reports are of little help in evaluating the lake trout stocks. These catch reports are provided, Schorfaar's affidavit says, by assessment fishing by licensed commercial fishermen. Yet, the Department of Natural Resources began making the assessments itself in 1976. Full catch reports apparently are not provided, since in 1979 a C.P.E. of 1.66 is reported, but the catch report is zero. Either failure to report the catch or changes in assessment procedures are reflected for the years 1973–74. In 1973 a catch of 5,152 pounds is reported, with a C.P.E. of 32.30. In 1974, the reported catch is 3,278 pounds, with a C.P.E. of 53.27, significantly higher than the year before.

The fact is, the sampling effort has varied radically over the years. In 1973, 48,000 feet of net were set; in 1974 only 15,000. But, this limited effort is used to establish a peak on the C.P.E. graph, which is then shown to decline precipitously. The bias is also reflected in the extraordinary 1974 catch from a single year class, the 1968 class, with other year classes already—before extensive gill netting—showing the decline which is reflected in subsequent years of sampling. Only the 1968 class continues to appear in high numbers, until 1978, when it too has nearly disappeared.

The 1974 sampling is critical to determine the cause of the reduced catches in subsequent years, yet it is inadequate. It suggests some independent factor operated to lower the stocks in MS–6 in that year, the commercial assessment fisherman focusing his efforts so as to maximize his catch and then abandoning his task.

One possible cause of the decline is a drop in the natural reproduction rates. This would leave fewer fish available for recruitment into the fisheries. The 1978 catch does not appear to eliminate this hypothesis with respect to MS–6.

The decline in lake trout in Whitefish Bay appears to reflect a general decline in the population across the southeastern shore of Lake Superior, whatever might be the cause. The Ad Hoc Working Group provides a table exhibiting the C.P.E. for lake trout age seven and older for various years. In 1971 this C.P.E. was 37 for MS–5, and 2.4 for MS–6. By 1978, the MS–5 C.P.E. is down to 10 and the MS–6 C.P.E. is down to .8. The relative decline in MS–6 is lower than in MS–5.

Fishing pressure in MS–6 has relaxed this year as a result of the opening of other waters to treaty fishermen. If wholesale reports are presumed accurate, 23,088 pounds of lake trout were taken from Whitefish Bay in 1978, but only 11,000 pounds had been taken from Zone MS–6 by August 31, 1979. This direction makes it unnecessary for this court to intervene.

The Ad Hoc Working Group suggested that any withdrawal of lake trout from Whitefish Bay would be incompatible with the goal of restoring a self-sustaining population in the zone. It proclaims its own data indicating a total allowable catch from Zone MS–6 of 3,100 pounds of lake trout over 21 inches, if wholly sustained by planting, unuseful as a management guide. This estimate apparently was based on a hypothesis of an admittedly high mortality rate. In fact, the report's conclusion regarding the standing stock would make reported catches impossible. It appears that the 3,100 pounds estimate also assumes continued planting at present, token rates. It is also based upon a population reduced by state policy decisions to make only such token plantings.

In its proposed Indian fishing allotment, the State allows 20,000 pounds of lake trout to be taken from Zone MS–6, the allotment being based on a native population of fat lake trout in the western end of the zone. The Ad Hoc report does not appear to take this population into account, for it does not authorize any such withdrawal from anywhere in the zone. The present levels of catch do not exceed this estimate of the available catch, nor did the evidence establish that no part of the present catch comes from this native stock.

Although the present levels of withdrawal of lake trout from Zone MS–6 may be excessive the evidence presented does not adequately establish this at the present time, and Indian catches are declining significantly. The evidence did not establish that the gill netting beginning in 1974 is the only cause of the decline in the stocks in Whitefish Bay. Greater effort by the State in restocking the Bay would permit harvest at present rates and even permit the harvest to increase. State withdrawal from the lake trout stocks by reduction of plantings has exceeded the reduction brought about by the Indian catch. Unknown factors brought about the decline even before Indian treaty fishing pressure began in 1974.

The State estimates that the sustained yield for whitefish in Whitefish Bay is 200,-000 pounds per year. The State has not shown regulation of the Treaty fishermen is necessary. The treaty fishery has never exceeded this amount. The state licensed fishery has often exceeded it. The State can avoid any excessive pressure on the whitefish resource by setting quotas for its licensed fishermen, a step which it has yet to take.

### D. The State's Showing of Irreparable Harm.

The State's evidence for each of the statistical zones reveals that it has utterly failed to show that Indian fishing has irreparably harmed lake trout, whitefish and other targeted species in the Michigan waters of the Great Lakes. Only in the case of lake trout was there any serious effort to establish this contention.

The State's basic objective here is to hold the Indians to the standards of its preferred management plan. Depletion is initially understood as a condition which harms the State's policy of fostering recreational fishing. The State knows politically and economically that it must allow a substantial harvest of lake trout by state licensed recreational fishers. State regulators like the recreational fisher, find him or her easier to regulate and more willing to accept Department of Natural Resources rules and requirements. Department of Natural Resources officials believe the motives of the angler—relaxation and recreation—more worthy and to their liking than the Indians who are motivated by a desire to feed their families.

The State also attempted to hold the Indian plaintiffs to standards which would apply if the lake trout stock were self-sustaining. Yet, depletion as a biological condition was not made out. When Indian fishing is measured against standards set out by the Ad Hoc Working Group, standards which would allow for a suitably sized population of potentially spawning fish, the Indian fishermen more frequently fish at rates which permit such a population than

do state licensed fishermen. Indian withdrawals exceeded the total allowable catch for a self-sustaining lake trout population in Zones MH–1, MM–3, MM–4 and MS–6. Even in MM–3 and MH–1 the Indian take was well below the take which would render the fishery put, grow and take. The tribes have now closed MH–1 to all fishing. There is a problem about the statistics for MS–6. Avoidance of clustering would overcome the problems. The state licensed sport fishery greatly exceeds the take permitting even a put, grow and take lake trout fishery in Zones MM–6 and MM–7. State sports fishermen alone exceed the self-sustaining allocation in MM–5, almost exactly doubling it. In addition, the State continues to authorize lake trout fishing in MH–1, and when their take is added to the Indian take, it exceeds even the put, grow and take option.

There is no zone where the Indian whitefish catch exceeds the allowable catch. However, the State sometimes permits its licensed fishermen to withdraw totals which, when added to those of the Indians, exceed the allowable catch.

■ Indian fishing may very well interfere with the sports fishery. However, the State's management plan is rooted in economics. A strong recreational fishery enhances the State's economy. But, the State may not simply carry out this policy. The State did not challenge the fact that the Indian tribes have treaty-protected and aboriginal rights to fish in the Great Lakes. When these rights are acknowledged, the present levels of Indian take are generally within acceptable levels.

While it appears that Indian fishing pressure may have been over-intense in certain areas of the Great Lakes, it is clear that the Indian tribes, together with the Secretary, are actively engaged in regulating the fishery in such a way that this will be prevented in the future, without interfering with the Indian's right of self-regulation.

*INDIAN TRIBAL REGULATION*

The State maintained that the Indians' use of the gill net is unlimited, and that this will ultimately lead to the collapse of the fisheries resources, and that the conservation codes of the tribes and the Secretary's regulations are nothing more than licenses allowing slaughter of lake trout, whitefish, coho salmon, and other species. The above review makes clear that this has not happened at the present time. The issue now considered is whether this will inevitably occur.

This court rejects the various curves submitted by the defendants to describe the Great Lakes fishery. These curves are based on unregulated, international fisheries and fisheries of the late 19th and early 20th centuries. There is no reason to believe that they represent the Indian fisheries of our time, where national and tribal governments limit individual effort, and these governments are no longer blinded by the myth of limitless resources. Nor are the curves helpful in describing present conditions in the Great Lakes, since, until the fish begin naturally reproducing, State planting efforts can be so manipulated as to duplicate the arch of these curves.

Berg testified about tribal fishing regulations and the Secretary's regulations of November 15, 1979, found in 25 C.F.R. Subpart D (Ex. P–301). The Secretary's regulations were formulated pursuant to a Memorandum of Understanding reached between him and the tribes. (Ex. P–308.) Draft regulations were prepared by the tribal chairmen, their attorneys, and Fish and Wildlife officials (9 Tr. 1575). The draft regulations were commented on by State officials who attended at least one drafting meeting (9 Tr. 1575). Thereafter, the tribes met, discussed and adopted the regulations which were then sent to the Secretary of the Interior for his consideration (9 Tr. 1575). He in turn made some changes and published the regulations in the Federal Register (9 Tr. 1576–77).

The purpose for these regulations is to protect the fishery resource during the 1980 season (9 Tr. 1578). They are subject to change, as the need requires.

The pertinent provisions of the Secretary's regulations were summarized by

Berg beginning at 9 Tr. 1579. Treaty fishermen are identified by cards issued by the tribes and the Bureau of Indian Affairs (9 Tr. 1580; 25 C.F.R. § 256.44). Catch reports showing fishing locations, total catch, type of gear and the like are required under 25 C.F.R. § 256.45 (9 Tr. 1581). Limitations on fishing activities are found in 25 C.F.R. § 256.46. Zone MH–1 is closed to all tribal fishers (9 Tr. 1583). Grand Traverse Bay south of the 45th parallel is also closed (9 Tr. 1584). Most of Little Traverse Bay is closed (9 Tr. 1584). The Lower St. Mary's River is closed to treaty fishers, as well (9 Tr. 1584). The regulations also contain restrictions on the size gill nets that permissibly may be used in areas of Lake Michigan (9 Tr. 1584). Target fishing for sport species and species listed by the Secretary as threatened and endangered is prohibited (9 Tr. 1586). Although lake trout is not defined as a sport species, there are harvest restrictions. If the catch of lake trout in any lift exceeds 20 percent of the total catch by weight, the individual making the lift shall not set nets in the same grid area for a period of ten days (9 Tr. 1588).

Spawning closures in Lakes Huron, Michigan and Superior are provided for in 25 C.F.R. § 256.46(d) (5 Tr. 1588). Further, nets may not be set within one half mile of the mouth of any rivers suitable for spawning (9 Tr. 1588).

In order to deal with emergency situations that arise during the fishing season, a joint emergency regulatory committee has been provided for (9 Tr. 1589). The committee consists of tribal chairpersons, conservation committee chairpersons and one licensed commercial fisher from each tribe. 25 C.F.R. § 256.47(a). If the committee does not take suitable action when required, the area director of the Bureau of Indian Affairs is authorized to do so in the committee's stead (25 C.F.R. § 256.57(b), 9 Tr. 1590).

Berg testified that in his opinion as an expert biologist, the Secretary's regulations were adequate to protect the fishery resource in the Great Lakes, at least for the immediate future (9 Tr. 1591). The regula-

tions were designed to be modified from one fishing season to the next. Further, Berg wanted to see them strengthened so as to close the entire St. Mary's River, not just the lower portion and to require some type of catch reports from subsistence fishermen (9 Tr. 1591–94). Only commercial fishermen had to submit catch reports to the tribes. Berg's conclusion that the regulations adequately protect the resource was based in part on the fact that the State manages the lake trout fishery on a put and take basis in several areas in the Great Lakes (9 Tr. 1594). Since there is no significant natural reproduction of lake trout from planted fish, it makes little difference to the resource who harvests the fish (9 Tr. 1594).

On April 28, 1980, these regulations were updated further, the tribes and the Secretary taking significant new steps for protection of the resource. 45 Fed.Reg. 28100. These regulations authorize seizure of equipment and gear for violations of the regulations, require catch reports 10 days after the close of the month, and require subsistence fishers to submit catch reports; the arrest power is expanded; all of the St. Mary's River is closed; a sanctuary is created below Fox Islands; no whitefish below 17 inches in length can be kept; depth restrictions on small mesh gill nets are adopted; the spawning closure of Lake Superior is expanded to include all of November; and, in a step which the State has shown unwillingness to adopt, treaty takes of whitefish and bloater chubs are limited in terms of the total allowable catch and lake trout takes are limited by the management option allowing sustained yield.

Berg took an informal survey on the number of tugs used by all tribal fishermen and concluded the number was approximately ten (10 Tr. 1630). However, of this total number, only four or five are operational at any particular time due to the delapidated condition of the tugs and their constant state of disrepair (10 Tr. 1630–31).

With regard to gill net selectivity, Berg testified, contrary to the testimony of state witnesses, that there is a significant differ-

ence between length frequencies of lake trout taken by 3.5 inch versus 4.5 inch gill nets (10 Tr. 1613). Similarly, there is a statistically significant difference between length frequencies of lake trout taken by a 4.5 inch versus 5.5 inch gill net (10 Tr. 1613).

A. [Mr. Richard Berg] I simply feel that there is no real solid evidence in this [Haas] report that lake trout are vulnerable to all sizes of mesh with regard to their life [sic] [length].

Q. [Mr. Bruce R. Greene] So that you are saying that a gill net will be somewhat selective even with respect to lake trout?

A. Significantly so, yes.

Q. But, you are also saying, I gather, that it would be more selective for whitefish because of the bony structure of lake trout in comparison to whitefish. Is that correct?

A. That is correct.

Testimony of Richard E. Berg (Direct), (10 tr. 1613). Further, according to Berg, a 5.5 inch gill net is sufficiently selective to allow lake trout and whitefish to reach first year spawning maturity. (10 Tr. 1615).

It is clear from the above that the Indian fishery is not "unregulated" and that Indian regulations compare favorably with State regulations. To mention just a few of the matters brought up by the State: the Indian fishermen supply catch reports just as do state licensed fishermen. The State, together with the federal government, has most of the data regarding the stocks. Director Tanner, despite his acknowledgment that it is theoretically possible for the State and the tribes to regulate side by side, declared that he was opposed to releasing State data to the tribes, even if it is indispensible to them if they are to set reasonable catch quotas. There is no obvious reason why the Indians should be required to duplicate these State and federal efforts.

Neither the State nor the Indians generally employ quotas. The State sets quotas only for certain experimental commercial operations. It claims that its creel limit on sports fishermen has a similar effect on total catch. The Indians impose similar restrictions on their fishermen, limiting the total incidental catch of lake trout, when targeting for whitefish, to 20%. The Indians have a quota of zero pounds for targeted lake trout. The United States, the tribes, and the State have authority to set quotas for fishermen under their jurisdiction. The State has more of the information needed to set responsible quotas, but appears to find quotas unnecessary at the present time or to consider its data inadequate. The State has not set general quotas and asked the tribes to adopt them.

Although the State indicated that selective gear may be absolutely necessary to protect endangered species, it did not proceed to demonstrate that gill nets cannot be so regulated as to provide the necessary protection. The evidence showed that the gill nets used by the Indians do result in an incidental catch of non-targeted species, with lake trout the principle victim. The tribes regulate the net mesh size, a factor which controls the frequency of catch of various sizes of lake trout and can exclude other species.

Entry into the Indian fishery is limited to members of the Indian tribes. About 200 tribal members have been licensed, compared to 130 state fishermen. I do not find it unreasonable that the tribes have not yet imposed a limitation on the number of licenses available and only indirectly limit them by the imposition of a sizeable fee. Given the part-time nature of the Indian fishery, it appears that the State and tribes similarly evaluate the carrying capacity of the lakes.

The tribes have begun radical zoning, declaring entire statistical zones off limits and excluding vast areas. The seasons adopted by the tribes coincide with those of the State.

## STATE PROPOSAL FOR REGULATION OF INDIAN FISHING

The proposal submitted by the State to show the court its concept of State regulation of Indian fishermen conclusively demonstrates its inability to comprehend its responsibility to its Indian citizens. Even if

the State had made out that the stocks had been irreparably harmed, that the fishery is unregulated and that gill net fishing necessarily leads to biological depletion, this court could not authorize the State to regulate according to this plan.

Under the plan, allocations are made to Indians from available fish supplies *after* the demands of the State's 130 licensed commercial fishermen are satisfied, the stocks are generally protected for sportsmen and all lake trout, with the exception of a few in Lake Superior, are delivered to the sportsmen. Other than the chub fishery, which has been closed to state licensed commercial fishers for several years and which is unsuitable for the type of gear possessed by Indian fishermen, the Indians have been allocated species that no one else wants, has previously caught, or is currently catching. (Tr. 1455). According to Tanner and Scott, the State's largess is limited to providing the Indians with "left overs." Notwithstanding the Indians' prior and paramount aboriginal federally protected right to fish in the Great Lakes, the State adheres steadfastly to the view that the tribes are interlopers, interfering with its perceived mandate to manage the resource for the principal benefit of state recreational fishers, for the secondary benefit of state licensed commercial fishers, and last and least, for treaty right fishers, provided however that State fishers are not disrupted. Indian fishermen would be obliged to provide for a self-sustaining stock of lake trout, even though the State does not require this of its sportsmen. They could not engage in any fishing, except for chubs and Lake Superior lake trout, until after they had found the capital and acquired the training necessary to operate sophisticated equipment which would replace their gill nets and make it impossible for them to continue fishing in small crews.

The State initially seeks to limit the number of Indian fishermen who can exercise the tribal rights, as it has limited the number of licenses which it offers its own commercial fishermen. The State objective is to foster the fishery by drastically limiting the number of fishermen and making it

"extremely profitable" for those who remain. This goal is mandated by this hardnosed view that the fishery is made up of fishermen out to make a "killing," to become wealthy, at the expense of the fishery. This model is in turn adopted from laizze faire economics—from the motivations it supposes, to the hypothesis of no government regulation on which it depends. Such dogmatics are of little use here. The Indian fishery reveals a tradition of part-time fishermen who pool limited capital so as to get a favorable return from small individual takes. Regulation, whether exercised by the tribes, the State or the federal government, modifies the behavior of men, even if it is supposed that their only motivation is economic gain.

The State attempted to justify its proposed regulations on the grounds that they would provide a moderate standard of living for perhaps 40 fishermen fishing with the State's preferred, expensive and nontraditional gear. When it came to demonstrate how even these 40 could make a living, it became clear that it would be necessary to ignore even basic expenses. No witness attempted to state a dollar amount each of the 40 could expect, or what a moderate standard of living is. They were nevertheless quite able to declare that these fishermen could have one.

 The proposed regulations are grossly discriminatory against the Indians in denying them their traditional gear, even without a showing that the stocks cannot sustain the take which these nets would capture. *Puyallup II.* It is discriminatory in allocating the lake trout to sportsmen and demanding of the Indian that he fish in such manner that he will not take any of the lake trout which the State acknowledges are available for harvest. *Puyallup II.* It is not necessary to regulate Indian fishermen when those without treaty rights are still permitted to withdraw vast amounts of fish from the same waters and the Indians are deprived of them. Even under an allocation system, where treaty fishers are required to contribute to preser-

**496**

vation of the species in the first instance, Indian fishermen are granted some initial proportion of available fish and non-treaty fishers are obliged to limit their catch accordingly. In Washington rivers and waters, where Indians explicitly hold their right in common with all other citizens in the territory, the Indians are entitled to no less than 45–50% of the available take. The State of Michigan seeks all of the fish its non-treaty fishermen want and presently take. It then graciously offers the remainder to the Indians. A more effective denial of treaty rights can hardly be imagined. It must not be forgotten that the Indians preserved unabridged one hundred percent of their aboriginal right to take fish, while the State fishermen have only a privilege. This is the law of the Constitution.

*CONCLUSION*

The State's application for a stay is denied. The State has failed to show likelihood that it will succeed in establishing that it can regulate its Indian fishermen like any of the other of its citizens. The State must acknowledge that the Indians of Michigan have aboriginal and treaty-secured rights to fish in the waters of Michigan, and it cannot exclude those Indians from their livelihood or prevent them from taking available fish by their traditional fishing methods. Once the standards defining the treaty rights of Michigan Indians are set forth, it is clear that the State has not made out that Indian fishing must now be extra-tribally regulated lest it be irreparably harmed during the appeal of this action. State regulation now would undermine the constitutionally authorized congressional policy of fostering Indian sovereignty just when the tribes are expending their control over their own fishermen. A stay pending appeal would alter the status quo, which is that Indian fishing is not regulated by the State at the present time. The regulations which the State proposed are wholly inconsistent with the Indian treaty right, discriminating against them, denying them the use of traditional gear, excluding them from most of the fishery so that it may be preserved for sportsmen and other state licensees. The

gill net, properly regulated, was not shown to be inconsistent with the restoration of lake trout, for the State contends some of the trout can be taken. Its principal objection is that it would rather have these fish caught by sportsmen.

Motions by all parties for admission of exhibits into evidence are granted.